No. 46,837

Vickridge First and Second Addition Homeowners Association, Inc., N. H. Pronko, Lee Phillips, III, Russell W. Taylor, George Reed, Dr. Harvey W. Hefley, Nick Onofrio, Jeff Lyle, Dr. D. O. Howard, D. R. Soder, A. K. Wilson, Dr. Norman K. Pullman, Jack Spines, Jr., and Dan Caliendo, *Appellees*, v. Catholic Diocese of Wichita, *Appellant*.

(510 P. 2d 1296)

Opinion filed June 9, 1973.

*Lawrence McDonough,* of Jochems, Sargent & Blaes, of Wichita, argued the

cause, and *Emmet A. Blaes,* of the same firm, was with him on the brief for the appellant.

*Roger K. Wilson,* of Arn, Mullins, Unruh & Kuhn, of Wichita, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

KAUL, J.: This was an action to enjoin defendant-appellant from constructing a gymnasium, a baseball diamond, a football field and track facility on property owned by it located in the Vickridge area of Wichita. Plaintiffs-appellees are certain individual home-owners in the area and the Vickridge First and Second Addition Homeowners Association, Inc. Defendant is the owner of Lot 28, Block 5 of Vickridge Second Addition to Wichita, comprising approximately twenty-five acres.

The appeal is from a judgment of the trial court enjoining the construction of the baseball diamond and the football and track facilities. Injunctive relief with respect to the gymnasium was denied and no cross-appeal taken.

The appellant owns and operates a coeducational parochial high school on the property in question known as Kapaun-Mount Carmel High School. For many years preceding the events giving rise to this litigation appellant operated two separate high schools in east Wichita. One of the schools was known as Kapaun Memorial High School, a boys school, and the other Mount Carmel, a girls school, was originally located on the tract in question. Within a few years after Mount Carmel had been in operation the area surrounding the campus was developed as a residential area and some of the homes were purchased by the homeowners-appellees.

In 1969 appellant commenced consideration of a plan to merge Mount Carmel and Kapaun and the result was a decision in 1970 to combine the two schools on the Mount Carmel campus. After study and investigation by committees, together with professional consultants, plans were developed concerning facilities to be constructed in order to serve the function of the combined schools. The original plan to move the Kapaun High School athletic stadium to the Mount Carmel site was abandoned. Architects employed by appellant prepared a site plan including locations and grading which was dated January 17, 1972.

The site plan and other information pertaining to the project

were made available to appellees through communications and discussions which were taking place at the time.

On April 11, 1972, appellees filed their petition instituting this litigation. In substance appellees alleged that the entire Vickridge area consisted of residential homes, costing between $75,000.00 and $225,000.00, and that the area was advertised during development as being a high quality residential neighborhood. It was alleged that the construction plans of appellant clearly show that the creation of a private nuisance to appellees would result from the actual construction of the planned facilities for reasons which were alleged in the petition as follows:

"(A) That Kapaun-Mt. Carmel High School has a present student enrollment of approximately 700 students and that the planned gymnasium facility is capable of seating 1500 persons at school, city league basketball games; but yet, the Defendant is providing less than 200 parking spaces to accommodate the people it is attracting to its facilities and is not planning to fence its school property. That the clear, necessary and obvious result of the foregoing is to burden almost the entire Vickridge area with a deluge of on-street automobile parking and most assuredly, those persons parking on the streets of the Vickridge Additions will seek the most obvious and direct walking route to the school facilities which will be across the lawns and between the homes of the Vickridge residents.

"(B) That because of the landscape contours of the Defendant's property and the Defendant's construction plans in connection therewith, a serious drainage problem will be created in that an inordinate amount of water will be diverted onto the property owned by some of the Plaintiffs, causing partial flooding of their homes and yards.

"(C) That Plaintiffs have been informed and verily believe that the football field, track, and baseball diamond which are located within a few feet of the property boundary lines, are to be used year around by the school and others for the city league athletic events and other athletic contests to the extent that an almost continuous level of athletic activity will be conducted on the facilities and that the present construction plans reveal that adequate 'screening' cannot be installed to protect the Plaintiffs from the obvious noise, dust and pollution which will be created by the activity.

"(D) That the effect of Defendant's entire construction project will be, among other things, to seriously devalue the property owned by the Plaintiffs in the Vickridge First and Second Additions."

The prayer of appellees' petition reads as follows:

"WHEREFORE, Plaintiffs pray that a temporary and permanent injunction be issued against the Defendant, its agents and employees, from constructing the gymnasium, football and track facility and baseball diamond as presently planned until and unless it can be shown that the matters set forth above can and will be eliminated and in all events avoided by proper planning and immediate implementation thereof."

Appellant filed its answer on May 9, 1972, in which it denied that its proposed project would constitute a nuisance to appellees or anyone else and further alleged that:

". . . [I]s providing adequate parking and drainage facilities for its project; the activities proposed for the area will cause no noise, dust or pollution."

There was no pretrial conference and the issues of a temporary and permanent injunction were tried together to the court on May 11, 1972.

In the meantime, appellant substantially revised its construction plans, in particular with respect to the drainage system for the football field and in moving the baseball diamond further away from the property lines. A drawing of the revised plan was prepared by appellant's architects and submitted to attorneys for the appellees several days before the trial. The achitects' drawings reflected a change order, dated April 28, which substantially changed drainage from the football field and track, and a change order which relocated the baseball diamond sixty feet in a southeasterly direction from the previous location thereof. The revised site plan and change orders were later received in evidence at the trial.

The appellees called five witnesses. R. S. Delameter, a civil engineer, experienced in land use, platting, planning, drainage and real estate development, testified primarily concerning the football and track facilities. Charles Porter, a teacher and coach at Kapaun-Mt. Carmel High School, described the proposed athletic activities and uses and the facilities. Earl J. Callison, a civil engineer with a baseball background as a coach and officer of the city urban little league, testified generally concerning the baseball diamond. James A. Loveland, a Wichita realtor, and Bowen H. Brady, a real estate appraiser, testified that appellees' properties would suffer diminution of value by reason of the proposed construction.

Appellant's evidence consisted of the testimony of Father Eugene Gerber, Vice-Chancellor of the Wichita Diocese, in charge of the properties, buildings and construction projects of the Diocese; exhibits consisting of the original and revised site plans and change orders, and a letter from the Bishop of the Wichita Diocese, addressed to the appellees, in which construction plans for the project and the uses thereof were set forth in some detail.

After hearing the evidence the trial court personally viewed the

site. On the following morning, May 12, 1972, after hearing the arguments of counsel, the trial court announced its decision from the bench. The court stated:

"It must be admitted that having viewed the premises has made a material difference in my mind in interpreting the evidence. The physical evidence presented has not conveyed the uniqueness of the locations nor have the words expressed in court here done so nor could a transcript of these proceedings do so. A view of the area now seems to me as almost having been imperative. As is known, the area was originally developed over a period of many years by a Wichita family, which used it as a residence and as an estate of rather large proportions. The landscaping is beautiful, particularly on the premises of the school. As we know high schools in most communities, this one might seem to be out of place there, although confined to purely academic purposes it has been well blended into the area. But the complaint here is that it is to be converted from a high school with academic activities only to one with public competitive intercity activities of a major nature, so far as high schools in this community are concerned.

"After having viewed the area and interpreting this experience with the evidence, perhaps the gymnasium with the activities planed there should not be enjoined. But it is clear that the other two facilities and the activities planned there must be enjoined."

The trial court expressed concern that successful competition in football could call for and is likely to precipitate night football games with lights and a public address system; and further that property owners could not expect promises or plans made today to remain the same in the future.

The court further observed that the injunction granted was based also in part on the diminution in value of appellee's properties.

The findings of the trial court were formalized in a journal entry wherein findings concerning the football field and baseball diamond were set forth in Findings Nos. 8 and 9, respectively, as follows:

"8. That it is reasonably probable and certain that noise, dust, debris and unsightliness will be created by the construction of the football field and track facilities; by its constant use for gymnasium classes, football practice, 'B' or Junior Varsity football games with its attendant spectators; and by its use for non-school related purposes on weekends and during the summer; that with reasonable certainty there will be trespassing across Plaintiffs' property by persons parking in the streets seeking the greatest accessability to the football field and track facility. That the Plaintiffs' privacy will be invaded, that the value of their property will be significantly decreased, that they will be greatly inconvenienced, annoyed, troubled and damaged as a result of the construction and planned use of the football field and track facility and that their enjoyment of their property and their comfort will be substantially interfered with.

"9. That it is reasonably probable and certain that noise, dust, debris and unsightliness will be created by the construction of the baseball diamond; by

its constant use for gymnasium classes, baseball practice, 'B' or Junior Varsity baseball games with its attendant spectators and by its use for non-school related purposes on weekends and during the summer. That with reasonable certainty the abutting property owners will be subjected to foul balls coming onto their property, causing them damage and causing them to live under the constant apprehension of foul balls coming onto their property, and that with reasonable certainty there will be trespassing across Plaintiffs' property by persons parking in the streets seeking the greatest accessability to the baseball diamond. That the Plaintiffs' privacy will be invaded, that the value of the property will be significantly decreased, that they will be greatly inconvenienced, annoyed, troubled and damaged as a result of the construction and planned use of the baseball diamond and that their enjoyment of their property and their comfort will be substantially interfered with."

Judgment was entered permanently enjoining appellant from constructing a football field, a track facility and a baseball diamond on its property. Thereafter appellant promptly perfected this appeal.

Appellant contends the trial court erred in basing its decision upon highly speculative testimony; testimony by witnesses who were not competent to testify; construction plans which had been abandoned; testimony which was not material to the issues; that there was no subsantial evidence to show that the proposed construction plans constituted threatened nuisance; that it was error to find as a matter of law that the construction would constitute an unreasonable interference with the appellees' enjoyment of their premises in the absence of any testimony by homeowners to that effect; that the court erred in anticipating that the Diocese would necessarily use its proposed facilities in a manner that would constitute a nuisance to the adjoining residents; and the trial court erred in placing its own subjective judgment over and above the evidence presented.

Basically, much of appellant's argument on appeal is that there was a lack of sufficient, competent and material evidence upon which the trial court could base its injunctive order prohibiting the construction of appellant's baseball diamond, football field and track facility on a threatened private nuisance theory.

At the outset, it should be noted that the relief sought here is the prohibition of the construction of facilities rather than the use thereof; and further that the nuisance alleged is only threatened rather than one presently existing.

Although, as we have indicated, appellees only prayed for an injunction against construction of the facilities "as presently planned until and unless it can be shown" that the matters complained of can

and will be eliminated by proper planning; the trial court, nevertheless, unqualifiedly proscribed construction of the baseball diamond and football field.

Generally, injunctions are only granted to restrain actual existing nuisances. However, in some instances a court of equity may enjoin a threatened or anticipated nuisance. With respect to a proposed use of land the rule is stated in 58 Am. Jur., 2d, Nuisances, § 147, as follows:

"A proposed use of land will not be restrained where it will not inevitably constitute a nuisance. If the complainant's right is doubtful, or the thing which it is sought to restrain is not a nuisance per se and will not necessarily become a nuisance, but may or may not become such, depending on the use, manner of operation, or other circumstances, equity will not interfere.

"Thus, where the anticipated injury arises from the use to which a proposed structure is to be put, and not from the structure itself, which will not be a nuisance, and is of such nature that it may be put to a lawful use which would not constitute a nuisance, the courts have generally declined to interfere with its erection on the ground that the contemplated use will necessarily be a nuisance. . . ." (pp. 725, 726.)

A court of equity may interfere by injunction to prevent a threatened injury where a proposed structure will be a nuisance *per se*, but a mere prospect, possibility or threat of future annoyance or injury from a structure or instrumentality which is not a nuisance *per se*, is not ground for an injunction and equity will not interfere where the apprehended injury or annoyance is doubtful, uncertain, speculative or contingent. (66 C. J. S., Nuisances, § 113, p. 879.)

The question of what constitutes a nuisance has been considered in many decisions of this court. Most recently in the case of *Culwell v. Abbott Construction Co.*, 211 Kan. 359, 506 P. 2d 1191, it was held:

"A nuisance is an annoyance, and any use of property by one which gives offense to or endangers the life or health, violates the laws of decency, unreasonably pollutes the air with foul, noxious odors or smoke, or obstructs the reasonable and comfortable use and enjoyment of the property of another may be said to be a nuisance.

"A private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his land. The concept of a private nuisance does not exist apart from the interest of a landowner." (Syl. ¶¶ 1, 2.)

The subject has also been considered in depth and many decisions discussed in the recent cases of *Baldwin v. City of Overland Park*, 205 Kan. 1, 468 P. 2d 168; *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, 453 P. 2d 82; and *Caywood v. Board of County Commissioners*, 200 Kan. 134, 434 P. 2d 780.

Nuisances fall into two categories—nuisance *per se* and nuisance *per accidens* or in fact. A nuisance *per se* is an act, instrument, or structure in which is a nuisance at all times and under any circumstances. A nuisance *per accidens* or nuisance in fact is an act, instrument, or a structure which becomes a nuisance by reason of surrounding circumstances. (*Dill v. Excel Packing Co.*, 183 Kan. 513, 331 P. 2d 539; and 66 C. J. S., Nuisances, § 3, p. 733.) Obviously, under the above definition neither a football field nor a baseball diamond, or the operation thereof, can be said to be a nuisance *per se*. (For example see *Riffey v. Rush*, 51 N. D. 188, 199 N. W. 523 [baseball]; and *Board of Education of Louisville v. Klein et al*, 303 Ky. 234, 197 S. W. 2d 427, [football].) Since the football field and baseball diamond are not nuisances *per se*, then the critical question for our determination is whether the proposed construction and uses thereof, under all the surrounding circumstances established by the evidence, substantially interferes with the comfortable enjoyment by appellees of the adjacent premises owned by them.

The difficulty in determining what is or is not a nuisance under particular facts and circumstances is compounded in a case such as that confronting us here where relief is sought from an alleged threatened nuisance rather than from the maintenance of an existing nuisance which is usually the case. Cases in which injunctive relief was sought to prevent the construction of a structure or instrumentality on the ground that a nuisance would result appear to be a rarity in this jurisdiction. While, on the other hand, our reports abound with cases in which relief by way of damages or injunction has been granted for a nuisance presently in existence.

Even in a case where the existence of an alleged nuisance depends upon facts and circumstances presently in existence, the precise application of fixed rules of law is seldom appropriate. In this connection, in the case of *Hofstetter v. Myers, Inc.*, 170 Kan. 564, 228 P. 2d 522, 24 A. L. R. 2d, 188, we said:

"While the word nuisance is perhaps incapable of precise definition, yet in general it is held to be something which interferes with the rights of citizens, whether in person, property, or enjoyment of property, or comfort. It has also been held to mean an annoyance, and, in its broadest sense, that which annoys or causes trouble or vexation, that which is offensive or noxious, or anything that works hurt, inconvenience or damage. (See 66 C. J. S., Nuisances, § 1, p. 727). What may or may not constitute a nuisance in a particular case depends upon many things, such as the type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency of continuity, and the nature and extent of the injury,

damage or annoyance resulting. Each case must of necessity depend upon its own particular facts and circumstances." (p. 568.)

Keeping in mind the principles heretofore stated, we shall examine the evidence in the record before us in the light of the trial court's findings and conclusions.

As previously indicated, the injunction judgment of the trial court, as it now stands, enjoins the construction of the football field and baseball diamond. We turn first to the evidence pertaining to the football field and track facility. Findings pertaining to the football field and track facility are set out in finding No. 8, heretofore quoted. Apparently, the trial court was satisfied that construction changes, relative to the drainage problem in connection with the construction of the football field, were entirely resolved since no mention of drainage was made in the court's findings, even though this was the most serious complaint voiced by appellees' witnesses. Mr. Delameter who testified concerning the football field, after being informed of the changes, stated:

". . . In my opinion, the plan as indicated by Exhibit 4 [the revised site plan] will adequately drain the east part of the school premises if the plan is carried out and built as it is shown and if it is maintained which is quite important. I don't think there is any question but what it would drain the track area and the football field. . . ."

Delameter further testified concerning parking premises and trespassing problems in general, but he had nothing more to say specifically about the football field.

Mr. Callison's testimony was confined almost exclusively to the baseball diamond.

Evidence of the proposed activities on the football field and track facility must be gleaned from the testimony of Charles Porter, a teacher and coach for appellant. In substance, Porter testified that football practice, involving approximately 100 players, would commence late in August and end either the first, second or third week of November, normally ending the first of November unless a varsity goes into play-offs. There would be three junior varsity or 'B' games on the field with approximately 100 or less spectators and 50 to 60 players from the combined competing teams. The junior varsity games would be played Monday afternoons at 4 p. m. There will be four home sophomore 'B' games with approximately the same number of spectators and players involved. The sophomore games start at 3:45 and are played on Thursday. There will be three freshman home football games with about the same number of spec-

tators and players involved and will be played on Wednesdays, starting at 3:45 p. m. Approximately 20 to 40 boys would be involved in track practice every evening commencing March 1 and usually running through the third week in May. Whether the football field is to be used for physical education is not definitely shown by any of the testimony.

According to the testimony of Father Gerber there will be no floodlights, public address systems, or concession stands in any of the athletic areas.

From this evidence the trial court found that it would be reasonably probable and certain that noise, dust, debris and unsightliness by the constant use of the football field and track facility with attendant spectators and by its use for nonschool related purposes on weekends and during the summer; and that with reasonable certainty there would be trespassing across appellees' property by persons parking in the streets seeking the greatest accessibility to the football field and track facility. We are unable to glean support for the findings made from the evidence elucidated. In finding that there would be trespassing across appellees' property the trial court has ignored the effect of fencing and the testimony of Father Gerber on this point. Father Gerber testified:

". . . With respect to the fence, our plan is the provision in the budget of $16,000.00 for a fence and/or shrubbery. Since this has seemingly not been accepted, a request has been made for an eight-foot fence and we would put an eight-foot fence along the north, east and west boundaries and we have not had a request for a fence on the south boundary."

As previously indicated, the south boundary of the campus adjoins Central Avenue and is not adjacent to the property of any of the appellees. An eight-foot fence on the other three boundaries of the campus would preclude spectators or students from trespassing on appellees' properties to gain access to any of the athletic facilities. This was admitted by the appellees' witness Delameter who testified:

"In my opinion, if the school had a minimum of a 6 to 8 foot fence erected around the perimeter of a school property, this would very effectively discourage parking and prevent people from walking or crossing over those properties from the street. This would very substantially reduce the problem of parking on the surrounding streets; probably eliminate it. I do not know whether or not such a fence is planned for the project."

Callison who testified concerning the baseball diamond had not considered the effect of a fence in his examination of the premises and when informed of it said:

"The construction of a 6 to 8 foot wire or cyclone type fence around the entire perimeter of the property would partially relieve the parking problem indicated; people would not be as prone to walk across or through the yards."

There is no indication in the record but what the fence will be constructed as agreed by appellant. In its remarks from the bench, the trial court expressed concern that uses of the football field might be changed in the future. The court stated:

"The grandstand of 100 seats today, with spirited games and good competition and increase in the community, could in a few years call for a grandstand with many more seats. Successful competition in football today could call for and is likely to precipitate night football games and lights and public address systems and all the trappings that go with football fields, even though not now planned. And as was said by a witness, 'the defendant could not guarantee or make promises binding through the years.' Neither can the property owners expect promises made today or plans made today to remain the same through the years."

There was no evidence before the court that any such changes would be made and no basis for its findings in this regard. Adequate relief affording protection to appellees, with respect to these matters, can be provided by modification of the injunction without proscribing the construction of the football field and track facility. The findings of the court in this regard appear to stem from the court's own idea about what might happen in the future rather than from any evidence submitted. Drainage and trespassing were the principal complaints concerning the football field and track facility and each has been effectively eliminated by the revised plans according to the appellees' own witnesses.

We next direct our attention to the evidence pertaining to the baseball diamond and the trial court's findings in this regard, which are set out in finding No. 9 quoted above. The main thrust of the trial court's findings in connection with the baseball diamond had to do with foul balls coming on the property of appellees and trespassing across their property by persons parking in the streets, seeking a greater accessibility to the baseball diamond. What has been said before adequately disposes of the trespassing problem. The only evidence concerning foul balls is the testimony of appellees' witness Callison. He testified that in the average seven inning game there would be between 180 to 250 total pitches and that there would be about ten percent—between eighteen to twenty-five—foul balls. He was unable to say how many of the foul balls would go on the property of appellees—he merely testified:

". . . There is as much a possibility of a ball going backwards or sideways as there is going out in the playing area. I would say that the people who live in Lots Nos. 9, 10, 13 and 14 are going to be subject to the most severe damage."

When Callison testified on direct examination his testimony was based on the premise that the baseball diamond would be in its original location with the first base 71 feet and 6 inches from the property line on the west and the third base line 83 feet from the property line on the north. When informed that the diamond was to be moved 60 feet to the southeast, away from the north and west property lines, he said foul balls that would cross the property lines would probably be reduced to five percent or a total of 9 to 13 during a seven inning game. Callison calculated that by moving the diamond 60 feet would probably result in moving the first and third base lines 30 or 40 feet farther away from the property lines. When informed that there was to be a six or eight foot fence surrounding the property Callison said that there would still be foul balls on the adjacent property, but stated: "I couldn't tell you today or any day how many foul balls will go onto the neighbors' property."

In addition to the eight foot cyclone fence, Father Gerber testified that a protective screen back of home plate was contemplated. He said the protective screen would be designed so as to eliminate or at least reduce to a minimum any chance of a foul ball leaving the batter and going into a neighbor's yard. The protective screen was also mentioned in Bishop Maloney's letter.

The testimony of Callison concerning problems which he foresaw in connection with the baseball diamond were at best highly speculative and obviously he had not considered the effect of the cyclone fence and protective screen in making his estimates concerning foul balls. The only testimony concerning dust was the general statement made by Callison that the dust problem would be created by the activities—"by the infield dust from a south wind. Then there is the noise, the trash, the litter." With respect to the noise Callison testified:

". . . If varsity baseball games are played at the facility and there were 150 to 200 people around the area, in my opinion, this many people watching the games would create noise. Baseball and noise go together like apple pie and ice cream. Basically, the team out on the field is always rooting for the pitcher, from the normal chatter developed through the unity of the team.

And also the players at bat are chanting to the players at the back and you have some parents hollering to their son or daughter who is playing. I don't know to what degree the noise is going to create but you do have some noise. If the location of the diamond is as projected, the people living on the property bounndaries will be able to hear the noise. I would say they would have to work pretty hard not to hear it."

Callison's testimony pertaining to noise was apparently based on the premise that there would be varsity baseball games with 150 to 200 people in the area.

Varsity baseball games are not presently scheduled for the diamond. In this connection Porter testified:

". . . All varsity games are to be played at another diamond and they will not be played at the Kapaun-Mt. Carmel site. There is the possibility of having home games in the future after next season."

Porter further testified that there would be five 'B' home games for baseball, starting at 3:45 and ending around 5:15 or 5:30 p. m.; that there are usually less than 100 spectators—more likely 50 and approximately 40 players from the two teams.

Witnesses Loveland and Brady testified that the proposed developments would have a detrimental affect on residential property value. Both, apparently, reached their conclusion in contemplation of the abandoned plan rather than in the context of the revised plan which included the fencing, relocations and drainage. Neither witness was able to testify with any degree of certainty. Loveland admitted that "it is almost impossible to say what degree the marketability and market value will be affected because no property surrounding the particular proposed changes has been marketed." Depreciation in the value of adjoining property is not of itself sufficient to warrant injunctive relief. In the case of *Dill v. Excel Packing Co.*, supra, it was stated:

"It may be generally stated that a court of equity will not interfere to prevent or abate as a nuisance everything which may work hurt, inconvenience or damage; but in order to call for such interference it must appear that the injury resulting from the alleged nuisance is or will be irreparable. So a mere diminution of the value of property by a nuisance, without irreparable mischief, will not furnish sufficient ground for equitable relief by injunction. . . ." (p. 523.)

With respect to the dust, noise and debris there is no evidence that debris will collect or become lodged on appellees' property. There will be no concession stands and any accumulation of debris either on appellant's land or on that of appellees is purely speculative. There were only some general statements by the witnesses

concerning dust and noise. Generally, noise to constitute a nuisance must interfere with a substantial right and it must be of such a character as to be of actual physical discomfort to persons of ordinary sensibilities. (58 Am. Jur. 2d, Nuisances, § 64, p. 633.)

In *Buckmaster v. Bourbon County Fair Ass'n,* 174 Kan. 515, 256 P. 2d 878, this court upheld the trial court's order overruling a demurrer to the petition wherein it was alleged that *clouds* of dirt and dust from a race track came against and into homes of adjacent property owners. Likewise, in *King v. American Rock Crusher,* 119 Kan. 618, 240 Pac. 394, an injunction against a rock crusher was upheld where *big clouds* of dust were created which settled on, in and about, the houses of nearby property owners. There is no evidence of probable clouds of dust here and under the circumstances shown to presently exist injunctive relief is not warranted. However, if dust from the baseball diamond should become a real nuisance then resodding or sowing of grass, or whatever is required, should be done. (*Neiman v. Common School District,* 171 Kan. 237, 247, 232 P. 2d 422.)

We are confronted, of course, with the familiar rule that findings of fact made by the trial court, based upon conflicting evidence or having substantial evidence to support them, are binding upon this court and will not be disturbed. Also, we have said many times that findings of the trial court should be construed so as to uphold, rather than defeat, the judgment. In this case we are not dealing with a nuisance *per se,* but a legitimate use of land which, it is claimed, will prospectively constitute a nuisance. In such a case, as we have noted, the evidence of the consequences of such use must be to a degree of reasonable certainty or probability in order to justify injunctive relief. From our examination of the entire record, we have concluded the evidence falls short of establishing to the necessary degree of certainty that appellant's proposed construction and uses of the baseball diamond and football field will cause such injury to appellees as to justify interferences by a court of equity in permanently enjoing the construction thereof. Moreover, we believe the trial court erroneously treated the evidence in several respects. First, it appears from the text of its findings that the trial court failed to take into account the modifications made in the plans, particularly with respect to the fencing and the moving of the baseball diamond. Second, the trial court anticipated uses not now in existence which might constitute a nuisance, such as varsity competition and the installation of floodlights and public address systems.

A court cannot anticipate an improper or unreasonable use of premises and enjoin a proposed use based upon surmise and speculation as to the future conduct of the occupants. (58 Am. Jurs. 2d, Nuisances, § 149, pp. 728-729.)

Third, from the context of the court's findings it appears that it largely based its decision on its view of the premises rather than to utilize the view so as to better interpret and understand the evidence produced in the courtroom. In many cases, such as that at bar, an inspection of the premises by the trial court is a useful tool in interpreting and understanding the evidence produced in the court room (For example see *Keimig v. Drainage District*, 183 Kan. 12, 325 P. 2d 316), but the general and we believe the better rule is that a court should not base its findings or decision on the result of such inspection either in whole or in part. (97 A. L. R., Anno. p. 335.)

Although the trial judge here stated that the view helped him interpret the evidence, he found that neither the evidence nor a transcript of the trial court conveyed the "uniqueness" of what he saw. In other words, his statement indicates that his decision was at least to some extent if not largely based upon what he saw and determined on his own, rather than on the evidence produced.

The posture of this case on appeal is quite similar to that presented in *Neiman v. Common School District*, supra, wherein the trial court at the instigation of adjacent property owners enjoined night softball games on the school grounds. On appeal this court determined that under the evidence the unqualified injunction could not stand and it was modified by setting aside the injunction as made and granting the injunctive relief justified by the evidence. The public address system, the use of floodlights after 10:00 p. m., and other particular matters were enjoined.

So—in this case—we are not inclined to close the door in the face of appellees for injunctive relief to which they are presently entitled or to which they may become so entitled in the future if appellant's use of the facilities becomes unreasonable and intolerable.

As we have noted, the prayer of appellees' petition asked that appellant be enjoined from constructing as presently planned until and unless it can be shown the matters set forth (A, B, C and D of the petition set out heretofore) can and will be eliminated. From the record we are convinced that appellant has made a good faith effort to eliminate the matters complained of and that if the modi-

fications and changes are carried into effect the complaints worthy of consideration will be resolved.

The result is that the judgment of the trial court must be modified by setting aside the injunction as made, provided the modifications and changes set forth in Exhibits 4, 6 and 7, including the construction of an eight-foot cyclone fence and the protective screen, as described in Father Gerber's testimony and in Exhibit 7, are constructed and installed according to the plans and testimony. The injunction should be granted against the installation of flood-lights, a public address system, a concession stand in any of the athletic areas, and the playing of varisty football and baseball games.

Finally, it should be noted that should there be a change in conditions, the parties have recourse to the remedy provided for in K. S. A. 60-910($b$).

The judgment of the trial court is modified as above set out and the cause is remanded for further proceedings in harmony with this opinion.

It is so ordered.

SCHROEDER, J., dissenting: The construction of a gymnasium, a baseball diamond, a football field and a track facility on the small tract of land here under consideration, with existing facilities already in place, at the locations shown by the exhibits introduced in evidence and the testimony of the witnesses places the football field, track facility and baseball diamond *in such close proximity to adjacent residential development* as to constitute a nuisance *per se*, in my opinion. Accordingly, the findings of the trial court are supported by the evidence and the judgment enjoining construction of these facilities should be affirmed.