**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 18 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

TED SCHEUFLER, DEBRA
SCHEUFLER, husband and wife;
PAUL SCHEUFLER, ELVA
SCHEUFLER, husband and wife;
HARVEY WILHAUS; ALICE M.
RICHMOND; MABEL V. COLLE
TRUST; KENNETH D. KNAPP,
EILEEN KNAPP, husband and wife;
PEIRCE KNAPP FARMS, INC., by
agent Walter C. Peirce; VIOLET
STOCKHAM; COLL-MAR FARM,
INC., and LEE SCHEUFLER,

    Plaintiffs-Appellees-Cross-
    Appellants,

        v.

GENERAL HOST CORPORATION, a
New York corporation,

    Defendant-Appellant/Cross-
    Appellee.

No. 96-3011
No. 96-3031

---

Appeal from United States District Court
for the District of Kansas
(D.C. No. 91 1053-T)

---

William R. Sampson (Bill J. Hays and Paul W. Rebein with him on the brief), of

Shook, Hardy & Bacon L.L.P., Overland Park, Kansas, for the appellant.

Lee Turner, of Lee Turner, P.A., Great Bend, Kansas, and Deborah Turner Carney, of Carney Law Office, Golden, Colorado, for the appellees.

_____

Before EBEL, LOGAN, and BRISCOE, Circuit Judges.

_____

BRISCOE, Circuit Judge.

_____

Plaintiffs, a group of landowners and tenant farmers in Rice County, Kansas, filed this trespass and private nuisance action against defendant General Host Corporation (General Host), alleging General Host's salt mining operations polluted a fresh water aquifer underlying plaintiffs' properties and prevented plaintiffs from raising irrigated crops on their land. Plaintiffs filed their action pursuant to 28 U.S.C. § 1332(a)(1), alleging diversity jurisdiction. A jury returned a verdict in plaintiffs' favor on their private nuisance claims and, following the verdict, the district court imposed punitive damages against General Host in the amount of $550,000. General Host appeals the jury's verdict and the award of punitive damages. Plaintiffs have filed a cross-appeal challenging the district court's decision to require the tenant farmers to join as party plaintiffs. We have jurisdiction pursuant to 25 U.S.C. § 1291 and affirm.

I.

Since 1908, the American Salt Company (American Salt) has operated a salt manufacturing plant in Rice County, approximately one-half mile southeast of Lyons, Kansas. From 1971 to 1988, American Salt was owned and operated by the Cudahy Company, a Delaware corporation with its principal place of business in Arizona. In turn, the Cudahy Company was a wholly owned subsidiary of defendant General Host, a New York corporation.

Cow Creek, a minor tributary of the Arkansas River, is located two miles south of Lyons. Underlying Cow Creek at varying depths of approximately ten to seventy feet is the Cow Creek Valley Aquifer, a fresh-water aquifer approximately one to two miles wide. The water in the aquifer flows in a southeasterly direction at a rate between one and one-half and five feet per day. Without the influence of pumping wells, it would take approximately ten years for the water in the aquifer to travel one mile.

Plaintiffs are owners and tenants of real property in rural Rice County, the majority of which is used for agricultural production. The specific breakdown of land ownership is as follows:

| Owner | Tract |
|---|---|
| Ted and Debra Scheufler | 160 acres in Southwest Quarter of Section 28, Township 20 South, Range 7 West. |

| | |
|---|---|
| Paul and Elva Scheufler | 80 acres in the West Half of the Southeast Quarter of Section 28, Township 20 South, Range 7 West. |
| Harvey Wilhaus | 277 acres in Sections 4 and 5, Township 21 South, Range 7 West. |
| Mabel Colle Trust | 147 acres in the Northeast Quarter of Section 33, Township 20 South, Range 7 West. |
| Kenneth and Eileen Knapp | 160 acres in the Southeast Quarter of Section 32, Township 20 South, Range 7 West. |
| Violet Stockham | 75 acres in the West Half of the Southwest Quarter of Section 12, Township 20 South, Range 8 West. |
| Peirce/Knapp Farms, Inc. | 80 acres in the South Half of the Southeast Quarter of Section 13, Township 20, Range 8 West. |
| Alice Richmond | 106.1 acres in the Southwest Quarter of Section 29, Township 20, Range 7 West. |

All of these parcels of real property lie, in whole or in part, over the aquifer. Prior to flowing under these parcels, however, the water in the aquifer flows under land occupied by the American Salt plant.

In 1977, owners and tenants of land upstream from plaintiffs filed suit against General Host, Cudahy, and American Salt, claiming salt from American Salt's mining operations had contaminated the water in the aquifer, leaving it

unfit for use in irrigating crops. Following a non-jury trial, the district court found the water in the aquifer was heavily polluted with salt, rendering it unfit for domestic and irrigation use. Miller v. Cudahy Co., 592 F.Supp. 976, 990-91 (D.Kan. 1984) (Miller I) ("Salt concentrations of over 30,000 parts per million have been recorded in water drawn from the aquifer."). This salt pollution, the court found, resulted from two sources directly attributable to American Salt-- through surface spills at the American Salt plant, and through direct subsurface leaks from American Salt's solution mining and settling activities. Although the court found growing irrigated crops (such as corn) would have been the most profitable use of the land owned by plaintiffs, it found the salt pollution of the water in the aquifer prevented plaintiffs from planting irrigated crops.[1]

Based upon these factual findings, the district court concluded the American Salt plant was a private, continuing, abatable nuisance *per accidens* (i.e., a private nuisance that could be abated through proper operation of the salt plant). Alternatively, the court concluded the plant was operated in a negligent manner and caused harm to the plaintiff landowners. Accordingly, the court awarded plaintiffs $3,060,000 "for the temporary damages to [their] annual crops wrought by the defendants' continuing abatable nuisance." Id. at 1005. In

---

[1] Some of the plaintiffs in the instant action were plaintiffs in Miller I. However, their claims were dismissed prior to trial on the grounds that the contaminated water had not yet reached the area underlying their real property.

addition, the court awarded plaintiffs $49,500 in consequential damages to two domestic water wells and a dairy operation, and approximately $8,200 in damages resulting from brine flowing over certain portions of plaintiffs' land. Finally, based upon what it concluded was defendants' wanton conduct, the court awarded plaintiffs $10,000,000 in punitive damages. On appeal, this court affirmed the district court's decision in substantial part. Miller v. Cudahy Co., 858 F.2d 1449 (10th Cir. 1988) (Miller II) (upholding findings of liability and award of punitive damages, but reversing decision to tax as costs against defendants approximately $40,000 in fees and expenses incurred by plaintiffs' trial expert during post-trial investigation of defendants' post-trial remedial efforts).[2]

In Miller I, the district court concluded the salt pollution in the aquifer posed a threat to other landowners downstream:

> Because the aquifer flows, the salt dissolved in it will continue to move downstream unless steps are taken to extract that salt. Thus, increasing numbers of the state's citizens will be injured as the pollution continues to spread. The aquifer joins the Arkansas River at Hutchinson, and that river then flows through Wichita, . . . before entering the state of Oklahoma.

---

[2] The pollution of the aquifer by American Salt has resulted in other related litigation. Specifically, the general liability insurer for American Salt and General Host filed suit in federal district court in Kansas seeking a declaratory judgment that it was not responsible to indemnify the companies for damages awarded in Miller I or for the companies' settlement of a second similar suit filed against them in 1984. The district court ruled in the insurer's favor, and this court affirmed on appeal. American Motorists Ins. Co. v. General Host Corp., 946 F.2d 1482, 1483 (10th Cir. 1991).

Miller I, 592 F.Supp. at 999.  However, both the district court and this court concluded the damage to the aquifer could be remedied.  Id. ("There is a very high probability that remedial measures could prove effective in removing a substantial amount of the pollution from the aquifer at a reasonable cost well within the range of the defendants."); Miller II, 858 F.2d at 1456 ("The damage to the aquifer is remediable.").

In 1987, the Kansas Department of Health and Environment (KDHE) ordered General Host to develop and implement a plan to clean up the aquifer. Following this order, in February 1988, General Host sold the American Salt plant to NAMSCO.  As part of the sale, NAMSCO agreed to take reasonable measures, at General Host's expense, to comply with KDHE's 1987 order.

In January 1987 (at approximately the same time KDHE issued its order to General Host) the Kansas Department of Water Resources (DWR) adopted an administrative policy which defined a specific area in Rice County (the Lyons Special Water Quality Use Area) where there was a known instance of contamination and water quality problems (i.e., the contamination caused by American Salt).  The policy set forth a procedure for DWR to use in reviewing applications for proposed appropriation of water for beneficial use in that area. In particular, the procedure allowed an application to be held until such time as

DWR could determine whether the proposed application would adversely affect the proposed cleanup.

In April 1990, the DWR enacted a moratorium on new permits for the entire Big Bend Water Management District (the District). The District encompasses parts of eight counties, approximately four or five million acres, including the Lyons Special Water Quality Use Area (which constitutes approximately one percent of the District's total acreage).

The instant case was filed by plaintiffs in February 1991. Plaintiffs claimed the contaminated portion of the aquifer had reached the area under their property and prevented them from growing irrigated crops. Accordingly, plaintiffs claimed the pollution from the American Salt plant constituted a trespass to their lands and a private nuisance that substantially interfered with their rights to use and enjoy their lands.

At the time the lawsuit was filed, none of the plaintiffs had applied for, or received, a permit from DWR to pump water from the aquifer. Subsequently, in 1993, all of the plaintiffs applied for such permits. To date, none of the permits have been acted upon by the DWR.

Trial commenced on June 27, 1995, and the jury returned a special verdict in favor of plaintiffs on their nuisance claims on August 1, 1995. In particular, the jury concluded (1) the groundwater underlying plaintiffs' properties was

unsuitable for irrigation because of salt pollution emanating from the American Salt plant, (2) plaintiffs were unable to irrigate because of salt pollution in the aquifer, and (3) plaintiffs' inability to obtain irrigation permits from the State of Kansas was not an intervening cause for plaintiffs' inability to irrigate. Based upon these conclusions, the jury awarded plaintiffs actual damages.

After the initial verdict was reached, the court held a second phase of trial before the same jury for the purpose of deciding whether punitive damages were appropriate. In their verdict on this second phase, the jury determined defendant was liable for punitive damages. Pursuant to Kan. Stat. Ann § 60-3702(a), the district court held an evidentiary hearing on September 11, 1995, to determine the amount of punitive damages to be awarded. On October 24, 1995, the court issued its order awarding plaintiffs $550,000 in punitive damages. In so doing, the court noted, in pertinent part, that "defendant continued to pollute the aquifer during the four years following the Miller [I] trial." Appellant's append. I at 174.

Defendant subsequently filed a motion for judgment as a matter of law, which was denied on December 6, 1995. On January 4, 1996, defendant filed its notice of appeal "from the final judgment for actual and punitive damages entered in this action on the 24th day of October 1995 and from an order denying General Host's motion for judgment as a matter of law entered in this action on the 6th day of December 1995." Id. at 191. Plaintiffs filed a cross appeal on January 17,

-9-

1996, "from the final judgment for actual and punitive damages entered in this action on the 24th day of October 1995." Id. at 194.

II.

Defendant's appeal

**Effect of plaintiffs' failure to apply for or receive irrigation permits**

Defendant contends plaintiffs' claims are barred because they did not properly apply for, or receive, irrigation permits, and because no groundwater was available for their use during the period in question. In support of this general contention, defendant presents a number of arguments: (1) Plaintiffs did not prove and could not prove any entitlement to use of the groundwater or to damages for its contamination; (2) the district court failed to properly apply Kansas water law to plaintiffs' claims and has substantially interfered with the program for management and conservation of Kansas water resources established by the Kansas legislature; (3) plaintiffs have no property interest in the aquifer and therefore cannot receive damages because there has been no invasion of a legally protected property interest; (4) plaintiffs' participation in the state system for water appropriation was not futile; (5) the assessment of damages against defendant is manifestly unfair; and (6) the court's refusal to apply Kansas water law is against public policy.

Because defendant is ultimately challenging the district court's denial of its motion for judgment as a matter of law, our scope of review is de novo. See Sheet v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir.), cert. denied 116 S. Ct. 74 (1995). Judgment as a matter of law is proper if the evidence, viewed in the light most favorable to the non-moving party, presents no genuine issue as to any material fact and the moving party should prevail as a matter of law. See Frandsen v. Westinghouse Corp., 46 F. 3d 975, 977 (10th Cir. 1995).

**Principles of Kansas water law**

Since the late 1880's, Kansas has followed the appropriation doctrine for water. F. Arthur Stone & Sons v. Gibson, 630 P.2d 1164, 1169 (Kan. 1981). "The appropriation doctrine is based upon the premises that all unused water belongs to all of the people of the state," and "[t]he first person to divert water from any source and use it for beneficial purposes has prior right thereto." Id. In 1945, the Kansas legislature enacted the Water Appropriation Act of Kansas (the Act) and created a procedure for acquiring water appropriation rights. Id.; see also John C. Peck & Constance Crittenden Owen, Loss of Kansas Water Rights for Non-Use, 43 U. Kan. L. Rev. 801, 802 (1995). More specifically, the Act created a permit system for acquiring appropriation rights. The Act also granted vested rights to all beneficial uses of water occurring at the time the Act became effective on June 28, 1945. All vested rights carry a priority senior to all

appropriation rights.  Both types of water rights "specify an authorized type of use (e.g., irrigation or municipal), annual quantity, maximum peak rate of pumpage, place of use (e.g., the given tract of land that may be irrigated), and point of diversion (e.g., the location of the well or pump site)."  Id. at 805.

The process for obtaining an appropriation right under the Act's permit system is multi-staged.  The first step is submission of an application.  If an application is approved by DWR, the applicant receives a permit formally called "an approval of application and permit to proceed."  Id. at 806.  "The permit sets deadlines for the construction of diversion works and for the beneficial use of water as authorized."  Id.  Typically, a permit allows a period of five years in which to use water and perfect the right.  If the deadlines are not met, the permit may be dismissed for failure to comply with its conditions.  "When the perfection period plus any extensions have expired, DWR personnel review the file and conduct a field inspection to calculate the extent to which the water right has been perfected."  Id.  DWR's calculation is formally documented in a certificate of appropriation.  "The certificate represents the final stage of the development of an appropriation  right.  Because the appropriation right is a kind of real property right, the certificate must be filed in the register of deeds office in the county where the point of diversion is located."  Id.

In summary, under Kansas law, a person does not acquire a water appropriation right upon the filing of an application with DWR. Rather, in DWR's view, a water appropriation right comes into being only after a permit is issued and the permit holder actually makes beneficial use of the water as authorized by the permit. See id. at 807.

**Was defendant entitled to judgment as a matter of law because plaintiffs lacked water appropriation rights in the aquifer?**

Applying the principles of Kansas water law to the uncontroverted facts of this case, it is clear plaintiffs do not have any water appropriation rights in the aquifer. At the time the lawsuit was filed in 1991, none of the plaintiffs had applied to DWR for a permit. In 1993, all of the plaintiffs filed applications for permits with DWR to pump water from the aquifer for purposes of irrigation. To date, however, none of those applications have been processed (apparently due to the 1990 moratorium).

Defendant contends it is entitled to judgment as a matter of law because plaintiffs' lack of water appropriation rights bars them from recovering damages for contamination to the aquifer. More specifically, defendant contends because plaintiffs do not have a right to use any of the water from the aquifer, they have not been injured by the contamination and thus have no cause of action against defendant.

If this were a water rights case, we would perhaps agree with defendant. The critical flaw in defendant's argument, however, is that plaintiffs have not claimed injury to any water appropriation rights. Rather, plaintiffs have consistently claimed, under a theory of continuing nuisance, that defendant's conduct unreasonably interfered with their use and enjoyment of their land, in particular their ability to grow irrigated crops on their land. See Finlay v. Finlay, 856 P.2d 183, 189 (Kan.App. 1993) (summarizing rules applicable to nuisance claims under Kansas law); see also United Proteins v. Farmland Indus., 915 P.2d 80, 85 (Kan. 1996) (noting nuisance actions can be based on theories of intentional nuisance, strict liability, or negligence). Consistent with this theory, plaintiffs sought and received an award of temporary damages for injuries caused to their land. See Miller II, 858 F.2d at 1457 (approving temporary damage formula utilized by district court in first trial); see generally Alexander v. Arkansas City, 396 P.2d 311, 315 (Kan. 1964) (where injury is temporary or remediable, measure of damages is depreciation of rental or usable value during continuance of injury within period limited by statute of limitations).

The fact that plaintiffs had no water appropriation rights in the aquifer and were not irrigating at the time the contamination occurred was not fatal to plaintiffs' continuing nuisance claims. In Vickridge Homeowners Ass'n, Inc. v. Catholic Diocese of Wichita, 510 P.2d 1296 (Kan. 1973), the Kansas Supreme

Court held that "'[a] private nuisance is a tort related to an unlawful interference with a person's use or enjoyment of his land.'"  Id. at 1302 (quoting Culwell v. Abbott Construction Co., 506 P.2d 1191, Syl. ¶ 2 (Kan. 1973)).  Although the particular use allegedly infringed must be "reasonable," id., there is no requirement that it be actual.  See Williams v. Amoco Production Co., 734 P.2d 1113 (Kan. 1987) (outlining essential elements of private nuisance claim; interference with actual use or enjoyment not an essential element of claim); see also Meat Producers, Inc. v. McFarland, 476 S.W.2d 406, 410 (Tex. Civ. App. 1972) ("in determining the existence of a nuisance, the jury is not limited to consideration of the actual use of the land").  This is entirely logical in light of the fact that the market value of land is tied not to the actual use of the land but rather to any reasonable use to which the land may be appropriated.  See id.; see also Alexander, 396 P.2d at 315.  Thus, although none of the plaintiffs had actually used their lands for growing irrigated crops prior to learning of the contamination in the aquifer, they were nevertheless entitled to proceed on their continuing nuisance claims.

This is not to say, however, that plaintiffs' lack of water appropriation rights was irrelevant.  As the district court correctly concluded, plaintiffs' lack of water appropriation rights was a potential intervening cause for plaintiffs' inability to grow irrigated crops on their land.  See Finkbiner v. Clay County,  714

P.2d 1380, 1384 (Kan. 1986) ("One person's [wrongful conduct] is not the proximate or direct cause of an injury where there is a new, separate, wholly independent, and efficient intervening cause of the injury and the loss."); see also Major By and Through Major v. Castlegate, Inc., 935 P.2d 225, 230 (Kan.App. 1997) (proximate or legal cause of injury is cause which in natural and continuous sequence, unbroken by efficient intervening cause, produces injury and without which injury would not have occurred). Because the parties submitted conflicting evidence on this issue, the district court properly submitted the issue to the jury. See Barkley v. Freeman, 827 P.2d 774, 778 (Kan.App. 1992) (generally speaking, question of whether particular act is proximate cause of injury is question for jury).

In conclusion, we believe the district court correctly treated plaintiffs' lack of water appropriation rights as a potential intervening cause for plaintiffs' injuries rather than as a complete bar to plaintiffs' continuing nuisance claims.

**Was it futile for plaintiffs to apply for water appropriation rights?**

In response to defendant's argument that the lack of water appropriation rights was an intervening cause for plaintiffs' inability to irrigate, plaintiffs argued that applying to the DWR for water appropriation rights would have been futile because the groundwater underneath their property was polluted with salt before the 1990 moratorium was established. In the instructions to the jury, the

-16-

district court outlined the procedure under Kansas law for obtaining a permit to irrigate, and specifically noted: "Kansas law does not allow a permit to be granted for irrigation unless it will actually be put into use. Where the water cannot be used, a permit application will be denied solely for that reason." Appellant's append. I at 137. With respect to plaintiffs' futility argument, the court instructed the jury:

> Plaintiffs contend that their failure to apply for irrigation permits and the 1990 moratorium do not constitute an independent and intervening cause because the salt pollution itself would have prevented plaintiffs from obtaining and using irrigation permits when they were available. In other words, plaintiffs contend it would have been futile to apply for irrigation permits.
> An act is futile when, under the circumstances surrounding it, the act will serve no beneficial purpose, and the circumstances which deprive the act of any benefit are known initially. The law does not require people to engage in futile acts.
> Plaintiffs have the burden to prove futility. If you determine that to apply for water use permits would have been futile, then you must find that the failure or inability to obtain irrigation permits is not an intervening cause for plaintiffs' inability to irrigate.

Id. at 139.

As reflected in the verdict form, the jury was asked a series of questions designed to determine whether salt pollution in the aquifer was the proximate cause of plaintiffs' inability to irrigate, or whether, as alleged by defendant, plaintiffs' inability to obtain irrigation permits from the DWR was an intervening cause for the inability to irrigate. In returning a verdict in favor of plaintiffs, the jury determined plaintiffs were unable to irrigate because of salt pollution in the

aquifer emanating from the American Salt plant, and that plaintiffs' inability to obtain irrigation permits was not an intervening cause. More specifically, the jury rejected defendant's assertions that plaintiffs' inability to irrigate was caused by plaintiffs' failure to obtain irrigation permits before 1990 and by the 1990 moratorium on new irrigation permits in the Big Bend Groundwater District. Implicit in these findings is an acceptance of plaintiffs' futility argument, i.e., the jury had to implicitly find the groundwater under plaintiffs' parcels of land was contaminated prior to 1990, rendering plaintiffs' pursuit of irrigation permits through the permit application process futile.

On appeal, defendant argues plaintiffs' participation in the state system for water appropriation was not futile. Although the precise nature of defendant's argument is not entirely clear, we construe the argument as a challenge to the sufficiency of the evidence underlying the jury's finding of futility.[3] As our circuit rules make clear, such challenges require submission and review of the entire trial transcript. See 10th Cir. R. 30.1.1 ("It is the responsibility of appellant's counsel to file an appendix sufficient for consideration and determination of the issues on appeal."); see also 10th Cir. R. 10.1.1 ("It is the

_____

[3] At the conclusion of its futility argument, defendant implies that plaintiffs failed to exhaust administrative remedies available to them. See appellant's br. at 29. We find no merit to this argument. Defendant has cited no Kansas authority that requires a landowner to seek administrative relief prior to filing a nuisance action.

-18-

appellant's responsibility to order and provide all portions of the transcript necessary to give the court of appeals a complete and accurate record of the proceedings insofar as such proceedings relate to the issues raised on appeal, and when sufficiency of the evidence is raised, the entire trial transcript ordinarily should be provided."). Because defendant has included only a small fraction of the trial transcript in the record on appeal, we conclude we do not have a sufficient record to review this issue. See Taylor v. Phelan, 9 F.3d 882, 884 n. 4 (10th Cir. 1993); Deines v. Vermeer Mfg. Co., 969 F.2d 977, 979 (10th Cir. 1992) (holding twenty pages of trial transcript insufficient for review of claims that verdict was against weight of evidence, that instructions were clearly erroneous, and that court made evidentiary errors).

### Defendant's other related arguments

Defendant has asserted several other related arguments concerning plaintiffs' lack of water appropriation rights. Specifically, defendant contends the district court failed to properly apply Kansas water law to plaintiffs' claims and has thereby substantially interfered with the program for management and conservation of Kansas water resources, the assessment of damages against defendant is manifestly unfair, and the district court's refusal to apply Kansas water law is against public policy. We find no merit in these contentions. Although defendant repeatedly contends the district court either refused to apply

or misapplied Kansas water law, the record on appeal simply does not support these contentions. To the contrary, the record suggests the court correctly outlined to the jury the method for obtaining irrigation permits under Kansas law. Notably, defendant has not challenged any of the court's jury instructions regarding plaintiffs' legal basis for recovery and the basis for assessment of damages against defendant.

### Did the district court err in allowing Lee Scheufler and Coll-Mar Farm, Inc., to join as plaintiffs during trial?

Defendant contends the district court erred in allowing tenants Lee Scheufler and Coll-Mar Farm, Inc., to join the action as plaintiffs under Fed. R. Civ. P. 17(a), and in allowing these new plaintiffs' claims to relate back to the date of commencement of this action. In support of these contentions, defendant argues these tenants knew their landlords had sued defendant, yet made a conscious decision not to join the action and incur legal expenses. Defendant further argues it was prejudiced by joinder of these parties because it did not conduct discovery in their claims. According to defendant, it may have had a viable defense against these parties because they may have renewed their respective lease agreements "with knowledge of the lost crop potential for some or all of the crop years at issue in the lawsuit." Appellant's br. at 35. As for the relation-back issue, defendant contends the tenants were new parties with new

causes of action and should have been allowed to seek damages for only the two years prior to asserting their claims.

Plaintiffs make several arguments in response. First, plaintiffs allege defendant was aware, prior to suit being filed, of written agreements between the landowners and tenants authorizing the landowners to pursue claims on behalf of their tenants. Second, plaintiffs argue defendant made a deliberate tactical choice not to raise the issue until mid-trial, and was at fault for doing so. Third, plaintiffs argue defendant was not prejudiced by joinder of the tenants. Specifically, plaintiffs allege defendant deposed every tenant during the course of discovery and, in at least two of those depositions, asked questions regarding how the landlord and tenant had agreed to proceed in this lawsuit. Further, plaintiffs alleged defendant not only failed to take advantage of additional discovery that was expressly authorized by the district court, but has also failed to explain on appeal why it did not do so. Finally, plaintiffs argue it would have been inequitable for the district court not to allow the tenants to join as plaintiffs in light of the fact they were injured by defendant's conduct, and in light of defendant's awareness of their injuries and their agreements with their respective landlords.

In allowing the tenants to join as plaintiffs, the district court relied on Fed. R. Civ. P. 17(a), which provides that "[n]o action shall be dismissed on the

ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." The function of Rule 17(a) "is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Rule 17(a) Advisory Committee Notes (1966). In reviewing a district court's decision to allow joinder of a real party in interest under Rule 17, we apply an abuse of discretion standard. See Harris v. Illinois-California Express, Inc., 687 F.2d 1361, 1373-74 (10th Cir. 1982); Metropolitan Paving Co. v. International Union of Operating Engineers, 439 F.2d 300, 306 (10th Cir.1971).

We conclude the district court did not abuse its discretion in joining the tenants as real parties in interest under Rule 17(a). Plaintiffs' failure to include the tenants as party plaintiff from the beginning was not the result of some tactic designed to prejudice defendant, but instead was the result of a mistake as to the legal effectiveness of the documents allegedly assigning the tenants' claims to their respective landlords.[4] See Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 20 (2d Cir. 1997) (failure to include proper plaintiff result of

---

[4] In Miller I, the district court allowed landowners to use such assignment agreements to recover on behalf of their respective tenants. Accordingly, plaintiffs in this action believed they could use similar assignment agreements.

mistake as to legal effectiveness of purported assignment of claims). Moreover, there has been no tangible showing that defendant was prejudiced by the joinder. Although defendant contends it was unable to conduct discovery on possible defenses relevant to the tenants' claims, this is simply untrue. After joining the tenants as plaintiffs, the district court expressly granted defendant the option of conducting additional discovery. Apparently, defendant chose not to do so. In any event, the record suggests defendant was well aware of the relevant parties in this action and what the critical issues would be, and thus should not have been surprised by the joinder. See Garcia v. Hall, 624 F.2d 150, 151 n.3 (10th Cir. 1980) (defendants would not be prejudiced by changing named plaintiff because "[t]hey knew the persons and the issues involved before the statute of limitations ran"). In particular, the record on appeal suggests defendant was well aware, from the beginning of the lawsuit, that the plaintiffs/landowners intended to recover on behalf of their respective tenants. Further, joinder of the tenants did not alter the complaint's factual allegations, nor did it substantially change the issues in the case. In fact, the joinder had no effect on the jury's function because the parties stipulated they would divide the damages between landowners and tenants after trial. Finally, it appears joinder of the tenants was appropriate to avoid forfeiture of just claims. See Fed. R. Civ. P. 15 Advisory Committee Notes (1966) (describing purpose of Rule 17(a)).

In a secondary argument, defendant contends it never moved for dismissal of any "action" or any "plaintiff," and therefore the district court should not have relied on Rule 17(a). This argument is disingenuous. Defendant knew from the beginning of this action that the plaintiffs/landowners were intending, pursuant to their agreements with their tenants, to seek full recovery for each parcel of land (including any portion of damages allocable to the tenants). By claiming mid-trial that the tenants were real parties in interest, defendant was essentially seeking dismissal of the tenants' claims for damages (which the landowners thought they had a right to bring). Accordingly, we conclude it was entirely appropriate for the district court to rely on Rule 17(a) in determining whether the tenants were real parties in interest and in joining them as parties to the action.

As for the relation back of the tenants' claims, the last sentence of Rule 17(a) specifically provides that "joinder . . . shall have the same effect as if the action had been commenced in the name of the real party in interest." In short, the language of the rule mandated that, once the district court concluded the tenants were real parties in interest and allowed them to join as plaintiffs, their claims automatically related back to the original filing of the action. See Advanced Magnetics, 106 F.3d at 21 (substitution of plaintiffs under Rule 17(a) "will relate back to the date of the original complaint under the express terms of that Rule"). Such a result seems particularly appropriate in light of the fact that

plaintiffs' failure to name the tenants as parties in the first place was due to their mistaken belief about the legal effectiveness of their assignment agreements with the tenants. Although defendant cites to Rule 15(c) in support of its assertion that the tenants' claims should not relate back, nothing in that rule undercuts the mandatory relation-back provision of Rule 17(a). See Fed. R. Civ. P. 15 Advisory Committee Notes (1966) ("The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c).").

**Did the district court err in awarding plaintiffs punitive damages?**

Defendant contends the punitive damage award imposed by the district court is duplicative and unreasonable because it was based on the same wrongful conduct previously punished by the district court in Miller I. In support of this contention, defendant points to a single sentence in a May 16, 1995, order in which the district court noted "a large punitive damages award in this case is unlikely as the defendant has already paid $10 million in punitive damages for the same wrongful conduct at issue in this case." Appellant's append. I at 91.

We disagree with defendant's interpretation of the district court's order. This order dealt with defendant's motion to bifurcate the trial into liability/actual damage and punitive damage phases. In noting significant punitive damages had already been imposed on defendant in 1984, the district court was expressly considering "the issues of fairness and economy," id., and was not intending to

make any definitive ruling with respect to defendant's liability for punitive damages in the instant case. For purposes of this appeal, the more telling order is the one issued by the district court on October 24, 1995. That order, issued after the jury had authorized punitive damages and after the court had conducted a hearing on the punitive damages issue, actually imposed punitive damages in the amount of $550,000 on defendant. In pertinent part, the court noted therein that "this case involves some wrongful conduct which occurred after the [Miller I] trial in addition to the original pollution of the aquifer." Id. at 171. Later in the same order, the court again emphasized that "defendant continued to pollute the aquifer during the four years following the [Miller I] trial." Id. at 174. Finally, the court specifically stated: "The court believes that the additional pollution [after 1984] warrants some additional punishment, but recognizes that the level of misconduct since 1984 is minor compared to the misconduct before that time." Id. at 175.

Because the district court specifically found that defendant continued to pollute the aquifer after 1984 (a factual finding which defendant has not challenged on appeal), and because the court specifically concluded the additional pollution warranted punishment, defendant's argument about being punished twice for the same conduct is baseless. Although defendant contends the pollution that occurred after 1984 would not yet have reached the groundwater under

-26-

plaintiffs' respective properties, there is no indication in the record that it presented this argument to the district court.

Even assuming, for purposes of argument, that the punitive damages award in this case is based on the same conduct at issue in Miller I, we conclude defendant's argument is meritless for several reasons. First, this case involves different plaintiffs from Miller I, and thus involves different injuries and damages. Second, the Kansas Supreme Court rejected a similar argument in McDermott v. Kansas Public Service Co., 712 P.2d 1199, 1201-03 (Kan. 1986). Although the Kansas Supreme Court has since expressed concerns about the extent of punitive damages a defendant may face in mass tort litigation, there is no indication the court would be receptive to completely eliminating punitive damage awards in successive lawsuits filed by different plaintiffs although the lawsuits arise out of the same course of conduct. See Tetuan v. A.H. Robins Co., 738 P.2d 1210, 1241-44 (Kan. 1987). Third, although the United States Supreme Court recently emphasized the Due Process Clause of the Fourteenth Amendment prohibits a state from imposing grossly excessive punishment on a tortfeasor, BMW of North America, Inc. v. Gore, 116 S.Ct. 1589 (1996), it did not hold multiple punitive damage awards arising out of the same conduct are unconstitutional. Fourth, defendant in this case was granted considerable procedural safeguards with respect to the punitive damage issue. In particular,

the court bifurcated the trial into actual liability/actual damages and punitive damages phases. Further, although the jury determined whether punitive damages should be awarded, it was the district court that determined the amount of those damages, and the court did so pursuant to strict statutory guidelines. Finally, as reflected in the October 24, 1995, order imposing punitive damages, consideration was given to the previous punitive damage award in Miller I. Accordingly, we conclude the punitive damage award in this case is entirely appropriate.

Plaintiffs' cross-appeal

**Did the district court err in concluding Kansas law precluded the tenants from ratifying the landowners' lawsuit on their behalf?**

In their cross-appeal, plaintiffs contend the district court erred in concluding Kansas law prevented the tenants from ratifying the landlords' lawsuit. Accordingly, plaintiffs argue, it was unnecessary to join the tenants as real parties in interest under Rule 17(a).

A proper ratification pursuant to Rule 17(a) requires the ratifying party to authorize continuation of the action, and agree to be bound by the lawsuit's result. Mutuelles Unies v. Kroll & Linstrom, 957 F.2d 707, 712 (9th Cir. 1992). In reviewing a district court's decision to allow or disallow ratification by the real party in interest, we apply an abuse of discretion standard. Arabian American Oil Co. v. Scarfone, 939 F.2d 1472, 1477 (11th Cir. 1991).

-28-

We find no abuse of discretion on the part of the district court in this case. Under Kansas law, the property interests of a landowner and tenant are distinct, and one may not recover damages based upon the other's interests. Binder v. Perkins, 516 P.2d 1012, 1017 (Kan. 1973). Further, Kansas law prohibits the assignment of tort claims. E.g., Morsey v. Chevron, USA, Inc., 94 F.3d 1470, 1478 (10th Cir. 1996); Heinson v. Porter, 772 P.2d 778, 783-85 (Kan. 1989), overruled in part on other grounds by Glenn v. Fleming, 799 P.2d 79 (Kan. 1990). Here, the district court correctly concluded ratification by the tenants in this case would have amounted to an assignment of their tort claims against defendant, a result that would have violated Kansas law.

## III.

Plaintiffs' response to defendant's motion to file a supplemental appendix is construed as a request to reconsider this court's order granting the motion. Plaintiffs' motion to reconsider is DENIED. Defendant's motions to file a second and third supplemental appendix are GRANTED. The judgment of the district court is AFFIRMED.