RADER, Circuit Judge.
 

 The United States Court of Federal Claims dismissed Ariádne Financial Services’s (Ariadne’s) breach of contract action as untimely filed.
 
 See Plaintiffs in Winstar-Related Cases v. United States,
 
 37 Fed. Cl. 174, 191 (1997). Because the trial court correctly determined that Ariadne’s claim had accrued more than six years before its filing, this court affirms.
 

 ■ I.
 

 In the 1960s and 1970s, federal regulations placed a cap on the interest a thrift institution could pay on deposits. As long as this maximum rate remained less than the interest rate the thrifts charged on home mortgages, their principal asset, the cap operated to the thrifts’ benefit. When interest rates rose in the late 1970s, however, thrifts could not raise interest rates to attract depositors. The thrifts’ share of the investment market began to wane. To alleviate this regulation-induced market imbalance, a 1980 act lifted the cap on the interest rates thrifts could offer.
 
 See
 
 Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. No. 96-221, 94 Stat. 132 (1980). With the cap removed, thrifts competed for deposits by raising rates. However, the costs of these short term deposits soon outstripped the thrifts’ income from long term, fixed rate mortgages. For this reason, among others, thrifts began to fail in large numbers. More than 400 thrifts declared bankruptcy between 1981 and 1983.
 
 See generally
 
 H.R.Rep. No. 101-54, pt. 1, at 296 (1989),
 
 reprinted in
 
 1989 U.S.C.C.A.N. 86, 92.
 

 The high number of bankruptcies threatened the health of the Federal Savings and Loan Insurance Corporation (FSLIC), which insured consumer deposits at thrifts. The Federal Home Loan Bank Board (FHLBB) — the regulatory agency responsible for overseeing federally chartered thrifts — responded to this impending crisis by encouraging healthy thrifts to purchase insolvent thrifts. To allow these acquisitions to proceed without the acquiring thrifts immediately becoming insolvent, FHLBB and the acquiring thrifts entered into contracts creating a paper asset commonly called “supervisory goodwill.” FHLBB accorded this asset value when assessing a thrift’s compliance with regulations governing minimum capital requirements. The agreements amortized supervisory goodwill over a fixed number of years. Despite such arrangements, the costs of bailing out insured thrifts continued to mount.
 

 In an effort to control these costs, the Financial Institutions Reform, Recovery, and
 
 *877
 
 Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183 (1989) (codified as amended in various sections of 12 U.S.C.), abolished FSLIC and FHLBB, transferred thrift insurance activities to the Federal Deposit Insurance Corporation, transferred the assets of failed thrifts to the Resolution Trust Corporation, created a new thrift regulatory agency — the Office of Thrift Supervision (OTS), and made substantial changes in the regulation of the thrift industry. Importantly, FIRREA adopted minimum capital requirements that prohibited the use of supervisory goodwill.
 
 See
 
 12 U.S.G. §§ 1464(t)(l)-(2) (1994). The statute instructed the director of OTS to promulgate implementing regulations,
 
 see id.,
 
 and provided that the director could grant limited exceptions to the capital standards,
 
 see id.
 
 §§ 1464(t)(6)-(8).
 

 On November 8, 1989, OTS published interim final rules, effective December 7, 1989, implementing FIRREA’s capital requirements.
 
 See
 
 Regulatory Capital, 54 Fed.Reg. 46,845 (1989) (codified as amended in various sections of 12 C.F.R.). On January 9, 1990, OTS issued a “Thrift Bulletin” emphasizing that the new regulations applied to thrifts that had been “operating under previously granted capital and accounting forbear-ances.” Office of Thrift Supervision, “Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund,” Thrift Bulletin No. 38-2, 1990 WL 309397 at *1 (Jan. 9,1990).
 

 Without supervisory goodwill as an asset, a number of thrifts that had entered into agreements with FHLBB could no longer comply with the regulatory minimum capital requirements. These thrifts undertook a variety of steps to regain compliance with these requirements. Several thrifts also sued the government for breach of contract. In
 
 United States v. Winstar Corp.,
 
 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court affirmed decisions of this court and the Court of Federal Claims that determined that FIRREA and its implementing regulations had caused the government to breach its contracts with healthy thrifts by forbidding the use of supervisory goodwill. The Court then remanded for determination of the damages caused by this breach.
 

 More than one hundred additional claimants have joined the original plaintiffs in
 
 Winstar.
 
 On September 18, 1996, the Court of Federal Claims consolidated these cases for the purpose of certain pretrial proceedings. The government then moved to dismiss twenty-six eases filed after August 9, 1995, for failure to meet the statute of limitations. The government argued that plaintiffs’ cause of action accrued on August 9, 1989, the date of enactment of FIRREA The Court of Federal Claims determined that accrual had occurred on December 7, 1989, the effective date of the FIRREA implementing regulations.
 
 See Winstar-Relat-ed Cases,
 
 37 Fed.. Cl. at 184. Accordingly, the Court of Federal Claims denied the government’s motion as to twenty-four of the twenty-six plaintiffs.
 
 See id.
 
 The other two plaintiffs had filed claims after December 7, 1995.
 
 See id.
 
 at 191. Ariadne is one of these two plaintiffs, and now appeals the dismissal of its claim.
 

 II.
 

 On April 30, 1987, Ariadne had entered into a series of transactions in which it provided a total of $36.9 million to purchase the Southern California Savings & Loan (SoCal) from government receivership. Ariadne purchased 89% of the preferred stock in the holding company that purchased the thrift from the government, 89% of the preferred stock in the thrift, and made a loan to the active investors who would be managing So-Cal. Ariadne also executed a document, the “Rebuttal of the Rebuttable Determination of Control” (Rebuttal), in which it promised to limit participation in the management of the thrift. As part of the transaction, FHLBB and FSLIC agreed that SoCal could use supervisory goodwill as an asset and amortize it over the next twenty-five years.
 

 Due to FIRREA, SoCal could no longer use supervisory goodwill to meet the regulatory capital requirements. Therefore, SoCal ended 1989 with inadequate capital. On March 2, 1990, SoCal filed an amended capital restoration plan with OTS. The plan contained restrictions on SoCal’s business .activi
 
 *878
 
 ties designed to bring it into compliance with the FIRREA capital standards. OTS approved this plan on April 18, 1990. In late 1990, OTS notified SoCal that it believed SoCal was not in compliance with the capital restoration plan. After SoCal failed to win approval for a revised capital restoration plan, it engaged in a series of recapitaliza-tions which culminated in the 1995 liquidation of Ariadne’s interest in SoCal for $50,000.
 

 Seeking reimbursement for its losses, Ariadne filed a breach of contract action in the Court of Federal Claims on April 16, 1996. Thus, April 16,1990, became the critical date for this application of the statute of limitations. Ariadne argued that its claim did not accrue until it first suffered damages from the government’s breach of contract.
 
 See Terteling v. United States,
 
 167 Ct.Cl. 331, 334 F.2d 250, 254 (1978) (“It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages.”). Ariadne maintains that the earliest possible date on which its claim could have accrued was April 18, 1990, when OTS first imposed restrictions on SoCal’s business activities. The trial court dismissed this claim for failure to file within the six-year statute of limitations in 28 U.S.C. § 2501 (1994).
 

 III.
 

 The relevant statute of limitations provides: “Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.” 28 U.S.C. § 2501. As a threshold matter, this statutory language confirms that the question of a time bar on Ariadne’s claim does not affect the subject matter jurisdiction of the Court of Federal Claims. The Court of Federal Claims has subject matter jurisdiction to adjudicate cases arising under the Tucker Act regardless of the timeliness of Ariadne’s actions. Ariadne’s untimeliness can, however, bar its eligibility to invoke that jurisdiction.
 
 See Borough of Alpine v. United States,
 
 923 F.2d 170,171 n. 1 (Fed.Cir.1991).
 

 In the contract at issue, the government promised SoCal the use of supervisory goodwill in partial satisfaction of its minimum regulatory capital requirement. In essence, the government promised to allow SoCal the use of an asset for twenty-five years. The government made no direct promises concerning the use of supervisory goodwill to Ariadne. Assuming, without deciding, that Ariadne was a party to this contract,
 
 see Resolution Trust Corp. v. Federal Sav. & Loan Ins. Corp.,
 
 25 F.3d 1493,1498-99 (10th Cir.1994), Ariadne’s breach of contract claim accrued when Ariadne should have known that it had been damaged by the government’s breach.
 

 In this case, Ariadne suffered damage when the government repudiated the contract before April 16, 1990. The government had promised to let SoCal use an asset for a period of twenty-five years. Approximately four years into the agreement, the government denied SoCal any use of the asset. Due to the restrictions on Ariadne’s actions to which it had agreed in the Rebuttal, Ariadne could not control SoCal’s response to the loss of the asset. Nevertheless, as the predominant holder of preferred shares in both SoCal and the holding company that owned SoCal, Ariadne also was damaged by the government’s breach. Loss of the supervisory goodwill made SoCal, and Ariadne’s investment in SoCal, considerably less valuable.
 

 The Court of Federal Claims determined that Ariadne should have known that it had lost the asset prior to April 16, 1990. This court detects no clear error in that determination. Indeed, SoCal itself was sufficiently certain that it had lost the use of supervisory goodwill that it filed a capital restoration plan on March 2,1990.
 

 The decision of our sister circuit in
 
 Resolution Trust,
 
 25 F.3d 1493, does not alter this determination. In that case, the Tenth Circuit discussed OTS discretion in the context of determining that the sovereign acts doctrine did not preclude a breach of contract claim.
 
 See id.
 
 at 1501-02;
 
 accord Winstar,
 
 518 U.S. at -, 116 S.Ct. at 2463 (“The Government’s final line of defense is the sovereign acts doctrine____ The Government’s position cannot prevail----”). Because the
 
 *879
 
 Tenth Circuit did not have before it the question of when the breach of contract claim accrued, its decision does not alter this court’s view of the trial court’s findings and conclusions.
 

 Likewise, the stabilization doctrine does not excuse Ariadne’s untimely filing. In
 
 United States v. Dickinson,
 
 the Supreme Court allowed a party to delay filing suit until the frequency of the flooding caused by a newly constructed dam determined whether the taking of the plaintiffs property was permanent or temporary. 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947). Ariadne would like to invoke this principle to delay accrual of its claim until the extent of its damage from the breach was reasonably certain. The
 
 Dickinson
 
 stabilization principle, however, does not apply outside its context. Later cases have essentially confined the stabilization doctrine to the class of flooding cases from which it originated.
 
 See United States v. Dow,
 
 357 U.S. 17, 27, 78 S.Ct. 1039,1047, 2 L.Ed.2d 1109 (1958) (“The
 
 expressly limited
 
 holding in
 
 Dickinson
 
 was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use.”) (emphasis added);
 
 see also Fallini v. United States,
 
 56 F.3d 1378, 1381-82 (Fed.Cir.1995) (collecting cases),
 
 cert, denied
 
 517 U.S. 1243, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996);
 
 Applegate v. United States,
 
 25 F.3d 1579 (Fed.Cir.1994) (applying stabilization doctrine to flooding caused by harbor construction project). Because Ariadne’s claim is not of this type, the stabilization doctrine does not apply.
 
 Cf. Cherokee Nation v. United States,
 
 124 F.3d 1413, 1417 (Fed.Cir.1997) (explaining that certainty of total damages not required for action to proceed).
 

 Finally, the continuing claims doctrine also does not postpone the accrual of Ariadne’s claim. The continuing claims doctrine often operates to save parties who have pled a series of distinct events — each of which gives rise to a separate cause of action — as a single continuing event. In such eases, the continuing claims doctrine operates to save later arising claims even if the statute of limitations has lapsed for earlier events.
 
 See Brown Park Estates-Fairfield Dev. Co. v. United States,
 
 127 F.3d 1449, 1456 (Fed.Cir.1997);
 
 Friedman v. United States,
 
 159 Ct.Cl. 1, 310 F.2d 381, 384-85 (1962). Accordingly, Ariadne would like to press separate claims for damages for each year in which SoCal lost the use of supervisory goodwill. However, the continuing claims .doctrine does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time.
 
 See Brown Park Estates,
 
 127 F.3d at 1457;
 
 Ap-plegate,
 
 25 F.3d at 1583;
 
 Hart v. United States,
 
 910 F.2d 815, 818 (Fed.Cir.1990). Here, Ariadne seeks compensation for repudiation of a contract that promised continuing performance into the future. There was a single repudiation by which the government made clear its intent to reject the terms of the contracts. Each subsequent denial of the use of supervisory goodwill does not give rise to a separate cause of action. Rather, the government’s continued refusal to allow the use of supervisory goodwill flows from its original repudiation. Because Ariadne’s claim does not involve a series of distinct events, each giving rise to an independent cause of action, the continuing claims doctrine does not act to preserve its claim.
 

 This court has long held that “a cause of action accrues when all the events have occurred that fix the defendant’s alleged liability and entitle the plaintiff to institute an action.”
 
 See Fallini,
 
 56 F.3d at 1380 (citations omitted). Ariadne asserts a breach of contract' claim against the government. The contract between the government and SoCal provided that SoCal could use supervisory goodwill as part of its minimum required capital for a period of twenty-five years. In short, the government agreed to let SoCal use an asset for twenty-five years. The government breached this contract by refusing to permit further use of the asset after only four years.
 
 See Winstar,
 
 518 U.S. at-- -, 116 S.Ct. at 2452-53.
 

 The government’s liability was fixed when it refused to allow use of the asset as it had promised. Before April 16, 1990 — the critical date for this filing — the government had
 
 *880
 
 enacted a statutory prohibition on the use of supervisory goodwill and issued regulations enforcing this prohibition. It then issued a notice of intent to apply these regulations to thrifts, including SoCal. The government ordered “[a]ll savings associations presently operating with these forbearances ... [to] eliminate them in determining whether or not they comply with the new minimum regulatory capital standards.” Thrift Bulletin No. 38-2,1990 WL 309397 at *1.
 

 This court need not determine today precisely which act constituted the government’s repudiation of its contract obligations. For the purpose of resolving the present dispute it is enough to note that SoCal was sufficiently convinced that supervisory goodwill was no longer available to it as an asset by March 2, 1990. On that date, SoCal submitted to OTS a capital restoration plan designed to bring SoCal into compliance with regulatory capital requirements without the supervisory goodwill asset. By that time, Ariadne knew or should have known that SoCal had lost this asset. Ariadne filed suit more than six years after this date. Title 28, section 2501 of the U.S.Code thus bars this particular Tucker Act claim.
 

 IV.
 

 Ariadne’s claim accrued more than six years before its filing in the Court of Federal Claims. Neither the stabilization doctrine nor the continuing claims doctrine prevent the action of the statute of limitations in this ease. Accordingly, Ariadne’s claim is barred by 28 U.S.C. § 2501, and the Court of Federal Claims properly dismissed its complaint.
 

 COSTS
 

 Each party shall bear its own costs.
 

 AFFIRMED.