**BANK OF AMERICA, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 95–660 C, 95–731 C, 95–797 C, and 95–803 C.**

United States Court of Federal Claims.

Jan. 16, 2002.

---

Steven S. Rosenthal, Holland & Knight, Washington, D.C., attorney of record for plaintiff Bank of America, FSB.

John C. Millian, Gibson, Dunn & Crutcher LLP, Washington, D.C., attorney of record for plaintiff Gerald L. Parsky.

Melvin C. Garbow, Arnold & Porter, Washington, D.C., attorney of record for

plaintiff Beverly Thrall and proposed intervenor Ray Doumani. David B. Bergman, Arnold & Porter, Washington, D.C., of counsel.

Toni C. Lichstein, Milbank, Tweed, Hadley & McCloy LLP, New York City, attorney of record for plaintiff William E. Simon. David S. Cohen, Milbank, Tweed, Hadley & McCloy LLP, Washington, D.C., of counsel.

Tonia J. Tornatore, with whom were Assistant Attorney General David W. Ogden, Director David M. Cohen, Assistant Director Mark A. Melnick, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., for defendant. Lee M. Straus, Commercial Litigation Branch, Civil Division, Department of Justice, of counsel.

## OPINION

WIESE, Judge.

### INTRODUCTION

This motion comes before the court as part of one of the *Winstar* cases—pending litigation that addresses the effect of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified as amended in various sections of 12 U.S.C.) on agreements made between the federal government and various savings and loan institutions in the 1980s. *See generally, United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

The *Winstar* suits were initially consolidated for purposes of case management before a single judge (former Chief Judge Smith), and issues identified as common to the cases were assigned to Issue Judges for disposition. Omnibus Case Management Order (September 18, 1996). Pursuant to this managerial scheme, the undersigned judge was charged with determining the date on which the statute of limitations began to run with

respect to the various claims arising out of the enactment of FIRREA. In the opinion that followed, we concluded that the claims had accrued, for statute of limitations purposes, as of December 7, 1989, the effective date of the Office of Thrift Supervision's ("OTS") regulations implementing FIRREA. *Plaintiffs in Winstar–Related Cases v. United States,* 37 Fed.Cl. 174 (1997). Accordingly, we dismissed two of the twenty-six suits then before us whose claims had been filed subsequent to December 8, 1995, and which therefore fell outside the court's six-year statute of limitations. 28 U.S.C. § 2501 (1994).

On appeal, the Federal Circuit addressed the limitations issue in *Ariadne Financial Services Pty. Ltd. v. United States,* 133 F.3d 874 (Fed.Cir.1998) and *Shane v. United States,* 161 F.3d 723 (Fed.Cir.1998). In separate opinions, the court upheld the conclusion that the two cases—filed on April 16, 1996 and February 22, 1996 respectively—were brought out of time, but declined to specify whether the statute of limitations period had been triggered by the August 9, 1989 passage of FIRREA, the December 7, 1989 regulations enforcing the statute, or the January 9, 1990 OTS bulletin announcing the government's intention to apply the new regulations to all thrifts.

Although the present case was among those addressed in our earlier opinion, the government now renews its motion to dismiss based on facts it maintains were discovered after that original decision was issued. The issues have been fully briefed, and oral argument was heard on December 18, 2001. We now rule in plaintiffs' favor.

### FACTS

The facts, as they pertain to this motion, are largely undisputed. In mid–1986, a group of investors, referred to here as "the Simon Group" or the "investor plaintiffs," [1] met with

---

1. The Simon Group essentially consisted of four investors: Gerald L. Parsky (who filed suit—Docket No. 95–731 C—in his individual capacity on November 6, 1995); Larry B. Thrall (who filed suit—Docket No. 95–797 C—on December 6, 1995 and is now represented by his successor-in-interest, Beverly Thrall); William E. Simon (who filed suit—Docket No. 95–803 C—along

with several other plaintiffs who are no longer participants in this litigation, on December 6, 1995); and Roy Doumani (who has a motion to intervene pending before this court).

The actions were consolidated pursuant to an order of the court dated June 3, 1998. Since that time, William E. Simon, by motion dated

government regulators to discuss the possibility of acquiring Honolulu Federal Savings and Loan ("HonFed"), a then-failing savings and loan institution located in Honolulu, Hawaii. The acquisition was approved by the Federal Home Loan Bank Board ("FHLBB") on August 29, 1986, and memorialized in FHLBB Resolutions 86–909 and 86–910. Pursuant to these resolutions, the investors created a holding company, H.F. Holdings, Inc., in order to purchase HonFed's common stock. The individual investors in turn purchased stock in the holding company in order to provide funds to recapitalize HonFed.

As part of the acquisition, and as an inducement to the investors to acquire the failing thrift, the government made a series of commitments regarding the bank's treatment of its regulatory capital. Included in these commitments was (i) the right to include supervisory goodwill (meaning the amount by which the bank's liabilities exceeded its assets at the time of acquisition) in the calculation of HonFed's regulatory capital; (ii) the right to amortize that goodwill over a 25–year period, and (iii) the right for a ten-year period to operate under regulatory capital standards less stringent than those applicable to other thrifts.

HonFed operated under these capital standards without incident for the subsequent two years following its acquisition. In mid–1989, however, HonFed entered into negotiations with another banking institution, First Nationwide, to acquire all of First Nationwide's Hawaiian branches. In anticipation of that proposed acquisition, and in accordance with Federal Home Loan Bank Board regulations, HonFed applied for regulatory approval of the acquisition on June 7, 1989.

By FHLBB regulation, approval for the acquisition required, *inter alia*, an evaluation of HonFed's regulatory capital. See 12 C.F.R. § 563.22(e)(1)(xii) (1989) (barring otherwise "automatic" approval of branch acquisitions where a thrift does not meet FHLBB's capital requirements); 12 C.F.R. § 571.5(c)(2) (1989) (setting forth FHLBB policy of considering "the adequacy of the

regulatory capital of the resulting or purchasing institution"). Accordingly, HonFed included in its application a five-year business plan that addressed two alternate scenarios: the bank's status with a capital infusion should the capital forbearances not be honored, and its status without a capital infusion should the modified capital requirement be maintained. HonFed's chairman emphasized, however, that the bank "strongly believe[s] that the Federal Home Loan Bank Board must honor and respect all forebearances and capital plans arising out of supervisory transactions." Letter from Gerald M. Czarnecki, Chairman and CEO of HonFed Bank, FSB, to James R. Faulstich, President, Federal Home Loan Bank of Seattle (June 13, 1989).

While the application for the branch acquisition was pending, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") on August 9, 1989, in response to the growing crisis in the savings and loan industry. FIRREA included within its terms the imposition of new industry-wide capital standards, which were to be put into effect through the promulgation of regulations by the newly created OTS, "not later than 90 days after August 9, 1989," and were to become effective "not later than 120 days after August 9, 1989." 12 U.S.C. § 1464(t)(1)(D) (1994). In that connection, the conference report that accompanied the FIRREA legislation directed that, "[u]ntil the capital standards required in this Act become effective, the capital regulations promulgated by the Federal Home Loan Bank Board remain in effect." H.R. Conf. Rep. No. 101–222, at 406 (1989).

On August 28, 1989, the OTS sent HonFed five proposed conditions for the agency's approval of the First Nationwide acquisition. Under these conditions, HonFed would not be required to meet FIRREA's capital requirements to complete the acquisition, but would instead be subject to liability growth and investment limitations until it met FIRREA's tangible capital requirement. Three days later, however, OTS notified HonFed

December 6, 2001, has voluntarily withdrawn from the suit. For ease of reference, however, we refer to the remaining individuals as the

"Simon Group investors" without ruling on Mr. Doumani's motion for intervention.

that it intended to postpone its decision on the First Nationwide acquisition for an anticipated 30 days based on the "significant issue of law or policy regarding whether the Office of Thrift Supervision should permit an institution not meeting the tangible capital requirement of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 to increase its insured deposits through a branch purchase." Letter from Darrel W. Dochow, Acting Senior Deputy Director for Supervision/ Operations, Office of Thrift Supervision, to David W. Hudson, Vice–President, HonFed Bank, FSB (August 31, 1989).

A series of discussions between OTS and HonFed followed, resulting in a letter from the OTS approving the acquisition subject to certain conditions. While the effective date of that letter is in dispute (a conflict we address below), the parties agree that approval for the purchase was conditioned on the infusion, by H.F. Holdings, of "additional capital into HonFed Bank ... in the amount necessary for HonFed to immediately meet the 1.5% tangible and 3% core capital requirements as promulgated under [FIRREA]." Letter from Ronald N. Karr, Acting Principal Supervisory Agent, Office of Thrift Supervision, to W. Charles Armstrong, President, HonFed Bank, FSB.

On November 14, 1989, in a matter unrelated to the First Nationwide acquisition, OTS sent a letter to HonFed prohibiting it from investing in certain mortgage products, due to the capital requirements of FIRREA. OTS explained that "[b]ecause of its level of tangible capital, HonFed is considered a troubled thrift institution. Therefore ... no further investment should be made in derivative mortgage products until Honfed has in place sufficient capital to meet the three minimum capital standards mandated by FIRREA." Letter from Duane H. Thorkildsen, Senior Supervisory Agent, Office of Thrift Supervision, to Gerald M. Czarnecki, Chairman and CEO of HonFed Bank, FSB (November 14, 1989).

The regulations anticipated by FIRREA took effect on December 7, 1989. In them, the OTS set "requirements for minimum levels of tangible, core, and total capital for all savings associations." 54 Fed.Reg. 46,845

(Nov. 8, 1989). By thrift bulletin of January 9, 1990, the OTS confirmed the general applicability of those standards, announcing that it was "applying the new capital standards to all savings associations, including those associations that have been operating under previously granted capital and accounting forbearances." Office of Thrift Supervision, "Capital Adequacy: Guidance on the Status of Capital and Accounting Forbearances and Capital Instruments Held by a Deposit Insurance Fund," Thrift Bulletin No. 38–2, 1990 WL 309397 at *1 (Jan. 9, 1990).

The Bank of America, successor in interest to HonFed, initiated this action on September 29, 1995, alleging that the "denial by the United States of the right to use supervisory goodwill and the subordinated debt to satisfy capital requirements constitutes a breach and repudiation by the United States of material terms of the contracts." Mr. Parsky, an investor in the Simon Group and a participant in negotiations to acquire HonFed, in turn filed suit on November 6, 1995. Mr. Thrall and Mr. Simon, additional members of the Simon Group, filed their complaints on December 6, 1995.

We are now faced with the question of whether these complaints are timely filed. For the reasons set forth below, we conclude that the relevant claims accrued no earlier than October 5, 1989—rendering Bank of America's action timely—and that the later-filed actions of the individual investors, though untimely in their own right, may nevertheless be heard as the claims of intervening parties whose separate causes of action relate back to the events encompassed in Bank of America's complaint.

## DISCUSSION

### I.

■ Under this court's statute of limitations, every claim over which the court has jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). For the purposes of that section, a claim accrues when "all the events have occurred which fix the liability of the Government and entitle the claimant to institute an

action," *Oceanic Steamship Co. v. United States,* 165 Ct.Cl. 217, 225, 1964 WL 8621 (1964) and "the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988).

In applying that test to the *Winstar* suits, the Federal Circuit has concluded that "[t]he government's liability was fixed when it refused to allow use of the asset as it had promised," *Ariadne,* 133 F.3d at 879–880, and the bank's breach of contract claim accrued when the bank "should have known that it had been damaged by the government's breach." *Id.* at 878. Accrual of the bank's claim, the *Ariadne* court explained, was triggered by "a single repudiation by which the government made clear its intent to reject the terms of the contracts." *Id.* at 879. The claim accrued, the *Shane* court agreed, "when the government repudiated its forbearance agreement." *Shane,* 161 F.3d at 726.

Both the *Ariadne* and *Shane* courts made clear, however, that individual action against a thrift by the government—as, for instance, the rejection of the thrift's proposed recapitalization plan—was not a prerequisite for a claim's accrual. Rather, in attempting to establish a breach of contract, it was enough to show that the thrift itself was sufficiently convinced that supervisory goodwill was no longer available to it as an asset. Unanswered by those decisions, however, was the question of whether a government action, taken against a particular thrift *prior* to the effective date of the December 7, 1989 implementing regulations, but relying on the heightened regulatory capital requirements set out in FIRREA, could constitute a breach of contract and thus mark the accrual of the bank's claims.

Defendant urges us to answer that question in the affirmative. In defendant's view, the *Ariadne* and *Shane* decisions stand for the proposition that plaintiffs' claims accrued "when the law changed"—an event, they argue in the present case, that occurred with the passage of FIRREA. Although that position was initially rejected in *Plaintiffs in*

*Winstar–Related Cases,* 37 Fed.Cl. 174—under the theory that FIRREA was not self-executing, but instead required the promulgation of regulations for the new capital standards to take effect—defendant maintains that the same result need not be reached here. That is the case, defendant argues, because OTS was immediately directed in the statute to use "other methods" to ensure that thrifts had "adequate capital," methods that, in defendant's view, constituted a breach of plaintiffs' contract. 12 U.S.C. § 1464(s)(1) (1994). Defendant thus points us to the date when OTS first required new capital compliance, and not to the date of the later-promulgated regulations, as the date of the claims' accrual.

In support of its contention that the government's alleged breach[2]—and hence the claims' accrual—occurred prior to December 7, 1989, defendant refers us to three OTS actions taken against HonFed. The first, an August 31, 1989 thrift bulletin, TB 31–5 (and subsequent OTS Legal Alert Memo No. 5, "Disclosure of Regulatory Capital by Savings Institutions in Securities Filings Made with OTS," dated October 9, 1989), required HonFed to disclose in its securities filings the means by which it intended to raise capital to satisfy FIRREA's capital requirements. In the second action taken against HonFed, OTS delayed approval of the proposed First Nationwide acquisition on August 31, 1989, in order to determine whether FIRREA's standards applied to the acquisition. Finally, in a letter dated November 14, 1989, the OTS prohibited HonFed from investing in derivative mortgage products "until Honfed has in place sufficient capital to meet the three minimum capital standards mandated by FIRREA." Letter from Thorkildsen to Czarnecki of 11/14/89 at 1. In each of those instances, defendant argues, the OTS took direct action to limit the use of supervisory goodwill in capital calculations, thus violating the terms of plaintiffs' contract with the government.

Plaintiffs offer a number of arguments in response. As an initial matter, plaintiffs contend that the government's motion does

---

**2.** As the issue of liability has not yet been determined in this case, defendant concedes the existence of a contract, and the breach of that contract, only for the purposes of this motion.

no more than attempt to relitigate this court's ruling in *Plaintiffs in Winstar–Related Cases* and, as a motion for rehearing, is therefore untimely. Plaintiffs additionally argue that none of the actions taken by the OTS prior to December 7, 1989 transform FIRREA from an anticipatory to an actual breach. No breach could have occurred, plaintiffs maintain, until the regulators actually calculated (or required HonFed to calculate) HonFed's regulatory capital pursuant to FIRREA, in a manner contrary to what the contract permitted. And since, in plaintiffs' view, the new capital requirements were not put into effect, and hence not applied to Bank of America, until December 7, 1989 (the date of the implementing regulations), that is the earliest date, they argue, that can be said to mark the breach. Finally, plaintiffs contend that the increased capital requirements imposed by the OTS as a condition of acquisition were not an implementation of FIRREA, as defendant claims, but were instead the agency's ordinary exercise of discretion to maintain an institution's safety and soundness.

In evaluating the parties' arguments, we begin with the precept first announced in *Plaintiffs in Winstar–Related Cases,* and unaltered by the Federal Circuit's subsequent holdings: FIRREA itself did not repudiate plaintiffs' contracts. That was the case, we explained in our earlier decision, because the regulations, and not the passage of the statute, was the "triggering act for any application of the new capital requirements." *Id.* at 183. Without the regulations, we continued, "FIRREA was essentially a legally binding forecast of a future breach of the forbearance agreements" that, in the absence of contractual non-performance, "falls well within the definition of an anticipatory repudiation." *Id.* at 183–184.

We did not, however, rule out the possibility that other actions taken by the government prior to December 7, 1989 could similarly trigger the statute of limitations. Indeed, the regulations were legally significant because "[o]nce [they] took effect, thrifts were legally subject to new capital standards that were in direct contradiction to the terms of their forbearance agree-

ments. . . . At this point, the Government's breach of contract was actual, and harm to plaintiffs was inherent and obvious." *Id.* at 185. It follows, therefore, that a government action which contradicted plaintiffs' forbearance agreements—for instance, one that interfered with their right to treat supervisory goodwill as capital—could likewise mark the claims' accrual. At the heart of our present inquiry, then, is a single question: when did HonFed first become subject to the restrictions imposed by FIRREA? In answering that question, we turn to the actions defendant cites as marking the date of the government's alleged breach.

### The August 31, 1989 Thrift Bulletin

■ In its renewed motion to dismiss, defendant makes a point of explaining that its motion does not constitute a request for rehearing of the earlier-decided statute of limitations ruling, but is instead premised on newly discovered evidence specific to HonFed. The August 31, 1989 bulletin and OTS Legal Alert Memo No. 5, however, were applicable to all thrift institutions, and were certainly documents of which the government should have been aware when it filed its original statute of limitations motion. That fact alone would deter us from disturbing our earlier statute of limitations ruling, at least with regard to those documents.

That observation notwithstanding, however, we nonetheless find that the August 31, 1989 thrift bulletin TB 31–5 did nothing more than set the stage for the new capital standards that would ultimately be imposed. In TB 31–5, for instance, the OTS directed that thrift institutions should

> disclose, and where appropriate discuss, in such securities filings the following information: . . . (d) the current and projected regulatory capital requirements for the thrift industry, under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, and the effect upon the institution of any projected regulatory capital requirements, including any applicable requirements such as the phase-out of goodwill and the imposition of any tangible and risked based capital requirements.

Office of Thrift Supervision, "Disclosure of Regulatory Capital by Savings Institutions in

Securities Filings Made with the Bank Board," Thrift Bulletin No. 31–5, 1989 WL 256457 at *1 (Aug. 31, 1989).

In the event that an institution was in danger of failing projected regulatory capital requirements, the bulletin required it to provide "a description of management's plans to satisfy the institution's current and projected regulatory capital requirements and the viability of such plans." *Id.* at *3.

In response to that directive, HonFed filed its form 10–Q, for the quarter ending September 30, 1989, on November 20, 1989. The 10–Q described HonFed's plans to comply with FIRREA, including the statement that "the Company's strategy for meeting the new capital requirements described above anticipates a proposed infusion of additional equity capital by HFH, which owns 90.3% of the outstanding capital stock of the Company."

While the two directives may have laid the ground work for the eventual implementation of FIRREA, we do not read them, however, as representing contractual non-performance sufficient to start the running of the limitations period. Notably, the regulatory capital requirements referenced in the publications are merely *projected* requirements, and no substantive consequences are associated with a failure to meet them. Thrifts in danger of failing the projected requirements are merely instructed to provide plans for future action—a mandate easily understood as preparing for FIRREA's implementation rather than actually implementing it. Significantly, the third-quarter regulatory capital calculations HonFed provided in response to that bulletin included the contracted-for supervisory goodwill and subordinated debt among the elements of HonFed's regulatory capital. *See* Office of Thrift Supervision, Memo to The Managing Officer of the Institution Addressed and The Institution's Thrift Financial Report Preparer (September 1989) (specifying that "the September 1989 Thrift Report form is the same as the June 1989 Thrift Report form."). We cannot therefore conclude that the August 31, 1989 bulletin and the October 9, 1989 Legal Alert Memo No. 5 signaled the government's non-performance of the contract or the accrual of plaintiffs' claim.

*The First Nationwide Acquisition*

█ If the issuance of thrift bulletin TB 31–5 did not mark the accrual of plaintiffs' claim, defendant argues that the claim nonetheless accrued when OTS postponed approval of the First Nationwide acquisition, or, in the alternative, when it conditioned that approval on compliance with FIRREA's capital requirements. Both actions, defendant maintains, reflected the government's refusal to count supervisory goodwill toward the bank's capital requirements, and should thus have put HonFed on notice that the government was no longer honoring its contractual commitments.

In a letter dated August 31, 1989, the OTS notified HonFed that it intended to postpone its decision on the First Nationwide acquisition for an anticipated 30 days based on the "significant issue of law or policy regarding whether [OTS] should permit an institution not meeting the tangible capital requirement of [FIRREA] to increase its insured deposits through a branch purchase." According to defendant, acquisition of the branches would automatically have been approved on September 5, 1989, if not for the operation of FIRREA. Thus any delay in approval beyond that date, defendant argues, reflects the application of FIRREA to HonFed, and thus the breach of plaintiffs' contract.

The regulation on which defendant relies for that proposition states:

> If, upon expiration of the applicable period for review of any complete application to which this policy statement applies, or any extension of such period, the Corporation [the Federal Savings and Loan Insurance Corporation] or its delegate has failed to approve or deny such application, ... the application shall be deemed to be approved ... by the Corporation or its delegate. For purposes of the previous sentence, the applicable period for review shall be (i) 60 calendar days ....

12 C.F.R. § 571.12(d)(1) (1989).

Defendant asks us to read the expiration of the 60–day period (falling on September 5, 1989) as a deadline for government action, *i.e.* the date by which OTS was either required to approve the branch acquisition or

to acknowledge that FIRREA at least temporarily prevented it from doing so. Plaintiffs were injured as of that date, defendant argues, because what would otherwise have been an "automatic" approval of the acquisition was deferred on the basis of FIRREA. And such a delay was impermissible under the contract, defendant further maintains, because plaintiffs were guaranteed the right to treat supervisory goodwill as capital for *all* regulatory purposes, including the satisfaction of capital requirements in connection with a branch acquisition. Defendant thus characterizes the very act by OTS of deferring its decision—occasioned as it was by the consideration of FIRREA—as a breach of plaintiffs' contract.

Defendant's argument only works, however, if one assumes that OTS had only two choices available to it at the end of the 60–day period: either to approve the acquisition (explicitly or through its inaction) or essentially to deny it. Yet the regulatory framework provided OTS a third alternative: to extend the time for its decision-making either under 12 C.F.R. § 571.12(e) (1989) (permitting an extension of time for review where OTS notifies an applicant "at least 30 days prior to the expiration of the applicable period for review . . . that such review period is being extended for 30 days" and where it "state[s] the general reasons therefore") or under 12 C.F.R. § 571.12(f) (1989) (permitting an unlimited extension of time for review of applications that raise "significant issues of law or policy"). Approval of an acquisition was therefore automatic only in those situations where the OTS had either failed to act, or failed to extend the period for its action, within the prescribed time-frame, and not to a situation where, as here, the agency has given notice that it intended to delay its decision. OTS thus had no absolute duty to complete the review process within the 60 days specified by 12 C.F.R. 571.12(d), and HonFed therefore had no corresponding right to a decision within that period. Accordingly, we cannot equate what was at most a minor delay with the breaching of plaintiffs' contract.

The conclusion that the time extension did not constitute a breach is further bolstered by the fact that OTS was merely determining whether FIRREA *should apply* to the transaction, and not, as of September 5th, actually *applying* FIRREA's heightened capital standards to the transaction. The very act of assessing "whether to permit an institution not meeting the tangible capital requirement of [FIRREA] to increase its insured deposits through a branch purchase" confirms that the determination to do so had clearly not been made. And without such a conclusion, defendant cannot be said to have breached its contract, since the hallmark of a breach— the government's refusal to allow the use of the asset as promised—necessarily implies a decision by the government as to how an asset is to be used. Only when that decision has been reached, and been communicated formally, has a breach in fact occurred.

Defendant argues, however, that the application of FIRREA's capital standards to the First Nationwide acquisition had indeed been determined and communicated to HonFed well in advance of the December 7, 1989 date on which the regulations took effect. According to defendant, HonFed was informed in an August 31, 1989 conference call that it needed to comply with FIRREA's capital standards before completing the acquisition, a condition defendant claims was repeated in a second conference call of September 22, 1989. OTS minutes from the August 31, 1989 call indeed note that HonFed's president expressed concern that "FIRREA won't be in effect for some time and [OTS][is] requiring [HonFed] to boost capital when they feel they have enough capital according to their acquisition agreement." The minutes go on to record that the OTS responded that "we are concerned with the institution's tangible capital level."

We can not, however, interpret that exchange as effecting a government breach. The record shows that the non-standard conditions that were to be imposed on HonFed were very much subject to discussion and debate, and were not confirmed, in their final form, until they were communicated to HonFed by letter as the official response to HonFed's application. A September 14, 1989 memo addressed to the Director of OTS, for instance, lists as an unresolved "Policy Issue"

the question of whether the OTS should "permit the branch purchase, by a tangible capital deficient institution, before a planned recapitalization." A September 22, 1989 summary of a briefing with the OTS Director further notes that the briefing "broke up before a resolution of Honfed was reach[ed]."

In light of that uncertainty, it would have been premature for HonFed to challenge anything other than OTS's final written determination. That is especially true where, as here, the formal nature of the application process would have led the parties reasonably to expect that OTS's ultimate decision would be committed to writing. And just as a cause of action does not accrue until "all the events have occurred that fix the defendant's alleged liability and entitle the plaintiff to institute an action," *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed.Cir.1995) (citation omitted), so too must it be the case that where a plaintiff is *not* yet entitled to institute an action—*i.e.*, because the claim is unripe—the claim cannot be said to have accrued. *Biddison v. City of Chicago*, 921 F.2d 724, 728–29 (7th Cir.1991); *Massachusetts Bay Transp. Auth. v. United States*, 21 Cl.Ct. 252, 261 n. 12 (1990). To hold otherwise would place a plaintiff in the untenable position of having the statute of limitations begin to run on a claim that the courts would not yet be willing to hear.

The same, however, can not be said for OTS' letter approving the acquisition. In that letter, the OTS alerted the bank that:

> Pursuant to the authority delegated by the Office of Thrift Supervision, the application is hereby approved, provided the following conditions are complied with to the satisfaction of the Supervisory Agent or successor thereto: ... 5. That prior to consummating the purchase of any offices from First Nationwide, H.F. Holdings shall infuse additional capital into Honfed Bank ... in an amount equal to the greater of $100 million less approximately $12 million in fees and expenses associated with raising the capital, or the amount necessary for Honfed to immediately meet the 1.5% tangible and 3% core capital requirements as promulgated under the Financial Insti-

tutions Reform, Recovery and Enforcement Act of 1989.

Plaintiffs ask us to read this provision merely as an exercise of OTS's discretion to ensure an institution's safety and soundness, and not as the implementation of FIRREA. Under that theory, the application procedure for a branch acquisition was a regulatory process completely separate both from plaintiffs' contract and from the mandates of FIRREA. OTS, in other words, was always free to impose increased capital requirements as a condition to acquisition, and was thus neither guided nor bound by FIRREA's not yet effective requirements.

Plaintiffs' position, we believe, goes too far. Clearly, the language of the letter—requiring the thrift to raise "the amount necessary for HonFed to immediately meet the 1.5% tangible and 3% core capital requirements as promulgated under [FIRREA]"-is sufficient to alert the bank that the capital standards under which they had been operating would no longer apply. If any uncertainty had existed as to the scope or application of FIRREA's terms to HonFed, the letter confirmed that the contractual arrangement, at least with regard to the acquisition, would no longer be honored. The October letter thus applied FIRREA in a concrete way, detrimental to plaintiffs interests and in violation of their contract. And it is that action—"the moment they were made subject to FIRREA's more stringent capital requirements" *Plaintiffs in Winstar–Related Cases*, 37 Fed. Cl. at 186—that must mark the accrual of plaintiffs' claims.

Nor, as plaintiffs argue, does the fact that FIRREA's regulations had not yet taken effect prevent the regulators' action from being construed as an enforcement of FIRREA. To suggest that the regulators based the approval conditions on concerns of safety and soundness totally divorced from FIRREA is to ignore entirely the circumstances surrounding both the acquisition's approval and FIRREA's passage. FIRREA, it must be remembered, was itself a measure designed to address the general safety and soundness of the thrift industry as a whole. And the approval, occurring after that passage and on the on the eve of the statute's implementa-

tion, directly referenced FIRREA in its conditions. One can thus not be viewed without reference to the other.

While it may be true that HonFed's cause of action would not have accrued until December 7, 1989, had they not sought approval for the acquisition, the approval letter effectively accelerated the application of FIRREA. In the face of capital requirements inconsistent with their contractual rights, plaintiffs had full notice that the government had "refused to allow use of the asset as it had promised," *Ariadne Financial Services*, 133 F.3d at 879–880, and HonFed "should have known that it had been damaged by the government's breach." *Id.*[3] Accordingly, we find that it was the approval letter, and not the December 7, 1989 regulations, that represented the actualization of the government's breach.[4]

### The Date of September/October Letter

Having concluded that the approval letter marked the first instance of the government's contractual non-performance and thus triggered the accrual of plaintiffs' claims, one matter remains outstanding. Defendant sets the date of the approval letter as September 27, 1989—a date that, if accepted, would render Bank of America's September 29, 1995 filing untimely. Plaintiffs characterize that version of the document as merely a draft, however, and point to a second version—dated October 6, 1989—as the only letter they contend HonFed received.

Of the two positions, plaintiffs', we believe, is the correct one. As an initial matter, the contention that the September 27th letter constitutes merely a draft is supported by the fact that the letter contains two significant errors: a date stamp of September 29th on its second page, while the first, third and fourth pages are dated September 27th; and

a line missing from the top of the third page. The only explanation the government proffers for the discrepancy in the two versions is that the second letter may have served to correct the errors in the first. The witness who suggested that explanation, however, described the theory as merely his "guess."

Indeed, there is no evidence in the record to support the contention that the September 27th version was sent at all. Unlike the letter of October 6, 1989, for instance, no copy of the September 27th letter was found in Bank of America's files. And while the government possessed a fax transmittal sheet confirming the faxing of the October 6th letter, no such sheet was found for the earlier letter. Perhaps most revealing, the September 27th version of the letter contains a list of addressees designated to receive "blind copies" (bcc)—information that should not, by definition, have been conveyed to the letter's recipient, and which was omitted from the October 6th letter.

Additionally, all of HonFed's internal documents are also consistent with the assertion that approval was granted on October 6th. In a September 27, 1989 internal memo to HonFed employees, for example, HonFed's chief executive officer explained that "we still do not have the final approval, but we are still very confident [the acquisition] will be approved." Memo from Gerry Czarnecki to HonFed associates, dated September 27, 1989. Similarly, an October 6th internal memo, also from the chief executive officer to HonFed employees, provided that "*today* we have received approval [of the acquisition]." Memo from G. Czarnecki to HonFed associates, dated October 6, 1989. (Emphasis added.) Finally, an October 6, 1989 press release announcing the approval was labeled "for immediate release."

---

**3.** Plaintiffs contend that they suffered no damage as a result of the newly imposed capital requirements because they were already committed to a course of action—the raising of capital—for reasons independent of the approval conditions. That fact, however, does not lessen the significance, as a matter of contract law, of the government's insistence on conditions that contravene the terms of plaintiffs' contract.

**4.** Because we conclude that the approval letter marked the accrual of plaintiffs' claims, we do not address the government's November 14, 1989 letter that specified that HonFed was prohibited from investing in derivative mortgage products "until Honfed has in place sufficient capital to meet the three minimum capital standards mandated by FIRREA." That language, however, like the language of the approval letter, clearly applies FIRREA to HonFed's operations.

The government offers nothing, either by way of documentation or testimony, to contradict the contention that the October 6, 1989 letter was the only version sent or received. In light of these recitals, then, we believe it more appropriate to describe the September 27th letter as a draft, and rely on the October 6th letter as the official date of the acquisition's approval. Accordingly, we conclude that October 6, 1989 marked the date on which the government first circumscribed plaintiffs' right to treat supervisory goodwill in the manner contemplated by their contract, and thus marked the accrual of plaintiffs' claim.

## II.

Because we hold that plaintiffs' claims had accrued by October 6, 1989, both Mr. Parsky's and Mr. Thrall's complaints, each filed after October 7, 1995, would appear on their face to be untimely. But that conclusion does not end our inquiry. Investor plaintiffs contend that even if their complaints are out of time, their claims may nonetheless be heard either because they constitute continuing claims or because they relate back to Bank of America's timely filed claim. We address those theories in turn.

*The Continuing Claim Doctrine*

 Under the continuing claim doctrine, a defendant that owes a continuing duty to another party gives rise to a new, separate cause of action each time it breaches that duty. *Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 803 (1992). If any one of those breaches falls within the statute of limitations period, the injured party is permitted to "defer litigious action until the termination of a continuing wrong," in order to spare the plaintiff "from having to pursue multiple actions." *Id.* at 803. Thus, claims that would otherwise be found untimely may nonetheless be pursued, so long as the last in a series of related, on-going actions falls within the six-year statute of limitations.

In investor plaintiffs' view, the continuing claim doctrine applies in the present case because the government breached the contract twice: first by conditioning approval for the branch acquisition on compliance with FIRREA, and later by implementing new capital standards in the December 7, 1989 regulations. Plaintiffs characterize these two actions as distinct events, predicated on separate sections of FIRREA—the first authorized by the instruction to regulators to employ "other methods" to ensure that thrifts had "adequate capital"; the second by the statutory directive to the agency to promulgate regulations implementing FIRREA's capital standards. Both actions, investor plaintiffs maintain, represent the breach of an on-going duty by the government, with the result that the statute of limitations may be measured from the date of the later-occurring injury.

In support of their position, investor plaintiffs relied at oral argument on a statement made in *Plaintiffs in Winstar-Related Cases* that the government was "into some dangerous territory, if it were to convince the court that both [the passage of FIRREA and the later circumscription of the use of goodwill] constituted breaches of contract." *Id.* at 181. That was the case, we there explained, because "plaintiffs likely could measure accrual from the moment of the most recent breach under the 'continuing claim' doctrine." (Citing *Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 803 (1992).) We went on to note, however, that only one breach was apparent in the *Winstar* context, and that "the Government did not subject itself to facing, into perpetuity, a new cause of action every time an act was performed pursuant to the statutory scheme that gave rise to the breach in the first place." *Id.* at 190.

Our conclusion that the plaintiffs in *Plaintiffs in Winstar-Related Cases* did not face a series of breaches is equally applicable here. Indeed, our admonition about the continuing claim doctrine was designed to reveal the logical conclusion to the *government's* argument in that case that even if the promulgation of the regulations constituted a breach, the passage of FIRREA also constituted a breach. But since we did not accept the government's factual premise there, and the government makes no such argument here, that earlier observation simply does not apply.

Indeed, our holding that the October 6, 1989 letter and the December 7, 1989 regulations do not represent separate incidents of breach is consistent with the decision in *Ariadne*. In *Ariadne*, the Federal Circuit rejected the application of the continuing claim doctrine in a virtually identical suit, noting that the doctrine "does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time." *Ariadne*, 133 F.3d at 879. The court went on to explain that Ariadne had suffered

> a single repudiation by which the government made clear its intent to reject the terms of the contracts. Each subsequent denial of the use of supervisory goodwill does not give rise to a separate cause of action. Rather, the government's continued refusal to allow the use of supervisory goodwill flows from it original repudiation.

*Id.* at 879.

Investor plaintiffs offer nothing to distinguish this situation from *Ariadne*, apart from suggesting that *Ariadne* spoke only to events that occurred after the promulgation of the regulations, and not to those that occurred before. But as the general principle is that FIRREA represented a single breach manifest in a series of discrete actions, we see no reason to distinguish *Ariadne* on that basis. Nor do we accept investor plaintiffs' contention that the limiting of the acquisition and the altering of the capital standards imposed separate injuries on the bank and thus reflected separate breaches. Investor plaintiffs' claims accrued when they were no longer entitled to use their contractual asset as they had been promised, regardless of the various forms such an injury would eventually take.

### Relation Back of Claims

In the alternative to their continuing claim theory, investor plaintiffs cite *Castle v. Unit-*

*ed States*, 48 Fed.Cl. 187 (2000)—a case decided by this judge—for the proposition that their claims relate back to the action filed by Bank of America and are therefore timely. That is the case, they argue, because (i) the claims arise out of the same conduct, transaction or occurrence alleged in the initial complaint; (ii) the investor plaintiffs' interests are closely enough aligned with those of the original plaintiff that the defendant had notice of their involvement; and (iii) the investor plaintiffs continued presence in the action would not substantially prejudice defendant. Defendant does not seriously dispute the first contention, but argues that the second criterion is not met since there is an insufficient identity of interest between investor plaintiffs and Bank of America to have put the government on notice of the later-filed claims.

With the exception of the *Castle* decision, however, the cases on which the parties rely deal, in the main, with Rule 15(c) of this court's rules of procedure and the identical language of that rule's predecessors. That is not surprising, perhaps, since Rule 15 specifically provides for the relation back of time-barred claims, and by extension, of time-barred plaintiffs. *See, e.g., Baldwin Park Community Hospital v. United States*, 231 Ct.Cl. 1011, 1982 WL 25837 (1982) (discussing the Court of Claim's 1969 Rule 39(c), identical to RCFC 15(c)); *Snoqualmie Tribe of Indians v. United States*, 178 Ct.Cl. 570, 372 F.2d 951 (1967) (discussing the Court of Claim's 1964 Rule 22(c), identical to RCFC 15(c)). RCFC Rule 15 provides:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.[5]

5. The Federal Rules counterpart, FRCP 15(c) provides:

> An amendment of a pleading relates back to the date of the original pleading when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and ... the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity

In *Castle,* however, we allowed the intervention by an otherwise out-of-time litigant under the theory that it was the "real party in interest" under RCFC Rule 17(a) (providing that an action filed by a plaintiff other than the real party in interest may be amended to permit either the joinder or the substitution of the real party in interest, with the subsequent action to be treated as if it had been "commenced in the name of the real party in interest"). There, we explained that when a suit is commenced by one who arguably has an interest in the enforcement of the claim and the real party in interest is later brought into the litigation, the joinder or substitution of the real party in interest relates back for limitations purposes to the date of the original pleading. *Castle,* 48 Fed.Cl. at 194 (citing *South African Marine Corp. v. United States,* 640 F.Supp. 247, 253–54 (C.I.T.1986); *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt., Inc.,* 620 F.2d 1, 3 n. 2 (1st Cir.1980); *Link Aviation, Inc. v. Downs,* 325 F.2d 613, 614–615 (D.C.Cir.1963)). That was the case, we noted, since "the final sentence in Rule 17(a) is designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought. Thus, a correction in parties is permitted even after the statute of limitations governing the action has run." *Id.* at 194–195 (quoting 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1555 (2d ed.1990)).

It should be noted, however, that as a matter both of principle and of procedure, Rules 15 and 17 evidence a considerable amount of overlap. *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 19 (2nd Cir.1997) (explaining that "the history of the Rules makes clear not only that [FRCP] Rule 15 was meant to be generally applicable to a proposed change of plaintiffs, but that in this regard [FRCP] Rule 17(a) is

implicated as well.")[6] As to the rationale behind them, Rule 15 and Rule 17 are each concerned with the same basic tenets: fairness to the parties, including adequate notice and the avoidance of prejudice, while at the same time including the proper parties in a timely action on the merits. *Summit Office Park, Inc. v. United States Steel Corp.,* 639 F.2d 1278, 1284 (5th Cir.1981) ("the intent of [FRCP Rule 15] is to assist the disposition of litigation on the merits of the case rather than have pleadings become ends in themselves."). Similarly, the rules, as a procedural matter, have each been used to allow the addition of an otherwise out-of-time plaintiff with a substantial interest in the suit at hand. *Snoqualmie,* 178 Ct.Cl. 570, 372 F.2d 951 (permitting relation back under a rule identical to Rule 15(c)); *Scheufler v. General Host Corp.,* 126 F.3d 1261, 1270 (10th Cir.1997) (permitting relation back under Rule 17). Indeed, the Advisory Committee Note to the 1966 Amendment to Rule 15 specifically noted the relevance of Rule 17(a), authorizing substitution of real parties in interest, to Rule 15(c). Notes of Advisory Committee, Rule 15(c) (1966 Amendments), reprinted in 39 F.R.D. at 84–85. *See also,* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1501 (2d ed.1990) (explaining that "the liberal attitudes toward substitution of the real party in interest prescribed by both Rule 17(a) and Rule 15(c) are closely related."). As a consequence, courts have often interchanged the rules, or have relied on them in tandem, to permit the intervention of parties whose claims were out of time. *See, e.g., Cummings v. United States,* 704 F.2d 437 (9th Cir.1983); *Metropolitan Paving Co. v. International Union of Operating Engineers,* 439 F.2d 300, 306 (10th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 68, 30 L.Ed.2d 58 (1971).

Despite that occasional conflation of the rules by other courts and the parties' reliance on Rule 15, however, we think Rule 17

---

of the proper party, the action would have been brought against the party.

**6.** We recognize that the cases relied on in our examination of the "relation back" doctrine draw upon Rules 15 and 17 of the Federal Rules of Civil Procedure rather than the court's own version of those rules. Nevertheless, we deem

this reliance justifiable because of the similarity in wording between the Federal Rules and our own, and because the court has traditionally looked to the case law interpretation of the Federal Rules as a guide in the interpretation of its own rules.

is a better conceptual framework for resolving the situation at hand. That is the case for two reasons: first, the situations governed by the Rule 15 cases deal primarily with additional plaintiffs who, though they share an identity of interest with the original plaintiff, nonetheless bring to the table additional injuries. Here, in contrast, investor plaintiffs' participation in the suit in no way enlarges the fact, nature, or amount of the government's liability. The scope of the claim remains the same: a claim for a single injury caused by the deprivation of supervisory goodwill. *See, e.g., Kansas Electric Power Co. v. Janis,* 194 F.2d 942, 944 (10th Cir.1952) (allowing the joining of additional parties under Rule 17(a) since the addition "did not change the cause of action in the slightest degree"); *Scheufler,* 126 F.3d at 1270 (allowing relation back under Rule 17 in part because "joinder of the tenants did not alter the complaint's factual allegations, nor did it substantially change the issues in the case"); *Nelson v. County of Allegheny,* 60 F.3d 1010 (3rd Cir.1995) (citing *Staren v. American Nat. Bank & Trust Co.,* 529 F.2d 1257, 1263 (7th Cir.1976) for the proposition that "[t]he substitution of such parties after the applicable statute of limitations may have run is not significant when the change is merely formal and in no way alters the known facts and issues on which the action is based.").[7]

That observation leads us to our second, more important reason for relying on Rule 17: while there can, in this instance, be only one recovery, it is not clear to whom the recovery belongs. No court has directly addressed the question of whether recovery for goodwill denied properly belongs to the bank, to its investors or holding company, or to its subsequent purchasers or receivers. And because we cannot conclude with certainty who the proper plaintiff in interest will be, we therefore can not exclude litigants who

may properly be before the court. That determination of claim ownership, we believe, requires a much more in-depth analysis of the nature of the injury claimed, and must be left to the trial judge.

Having decided, then that Rule 17(a) must govern, we turn to the question of whether it in fact applies. In answering that question, we note first that the injuries of which the investor plaintiffs complain are fundamentally the same as those alleged in the earlier-filed Bank of America complaint: the reneging, by the United States, of "the contractual commitments concerning the goodwill and subordinated debt issued in connection with the conversion." In his complaint, for instance, Mr. Parsky alleges that the capital regulations, as applied by OTS, precluded HonFed from "fully including supervisory goodwill ... in the calculation of [HonFed's] regulatory capital; precluded HonFed ... from operating under [HonFed's] Modified Capital Requirements contractually agreed to by the government; and precluded [HonFed] from executing its government-approved business plan." Those limitations in turn forced the thrift to pursue steps that Mr. Parsky maintains resulted in substantial harm to the institution. Accordingly, he based his breach of contract claims on "the application of Capital Regulations and the imposition of other requirements and sanctions... in contravention of the government's contractual promises."

Similarly, Mr. Thrall's complaint provided that "the government made express promises regarding the regulatory capital treatment to be accorded HonFed ... including, inter alia, contractual promises that [the thrift] could include supervisory goodwill in the calculation ... of regulatory capital, to be amortized over a specified number of years ...." The complaint further alleged that "[a]s ap-

---

7. We recognize that the same rationale has been applied in cases decided under language identical to Rule 15. In *Baldwin Park Community Hospital v. United States,* 231 Ct.Cl. 1011, 1012, 1982 WL 25837 (1982), for instance, the court allowed the addition of 36 plaintiffs that were "operated and owned, either directly or through subsidiary corporations, by plaintiff..., or by a company to which [plaintiff] is the legal successor in interest" in part on the grounds that

"defendant is not prejudiced by the amendment because the amended claims are not new or different, but rather virtually identical to the original claims." It should be noted, however, that the *Baldwin* decision dealt with Health, Education and Welfare (now Health & Human Services) reimbursement claims, such that the inclusion of the additional plaintiffs necessarily introduced additional injuries.

plied by OTS, the Capital Regulations precluded HonFed ... from fully including supervisory goodwill ... in the calculation of [its] regulatory capital; precluded HonFed ... from operating under the HonFed Modified Capital Requirements contractually agreed to by the government; and precluded [the thrift] from executing its government-approved business plan."

The Bank of America, for its part, makes clear that it is the successor to both HonFed and H.F. Holdings, Inc. Indeed, each of its claims specifically implicate the bank's previous owners: Count I seeks damages for the breach by the United States "of material terms of the contracts with the Bank's predecessors in interest"; Counts II and III seek "restitution of all benefits its predecessors in interest conferred upon the United States"; Counts IV and V allege the Fifth Amendment taking of contract rights "of the Bank's predecessors in interest"; and Counts VI and VII seek damages based on the government's "depriving the Bank's predecessors in interest of property without due process of law."

In view of those recitals, we conclude that Mr. Thrall and Mr. Parsky are in essence pursuing the same claim as Bank of America: compensation for the injury caused when their supervisory goodwill was no longer counted in a way consistent with their contract. Defendant is thus not prejudiced by the inclusion of the plaintiff investors because their participation requires no revision of the government's defense. Whether the claim ultimately belongs to investor plaintiffs or to Bank of America in no way alters defendant's liability, or the nature of its case. Under such circumstances, we find the claims of investor plaintiffs to relate back under Rule 17 to Bank of America's timely filed claim.

We must, however, pause here for two reasons. First, we recognize that *Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001), stands for the proposition that shareholders are *not* third party beneficiaries entitled to enforce a breach of contract claim against the United States. But we do not understand that to be the situation in the present case. Plaintiffs have represented that Mr. Parsky

and Mr. Thrall were participants in the negotiations with the government, and signatories to the contractual documents in their own right. Such participation has on occasion led to recovery. *See Bluebonnet Savings Bank v. United States*, 266 F.3d 1348 (Fed.Cir. 2001).

Second, the fact that the original plaintiffs in *Castle* were investors in the thrift, and the party attempting to file out-of-time was the successor to the bank itself may ultimately distinguish it from the suit at bar. That is the case because, as explained above, the ruling in *Castle* was predicated on the notion that the investors were essentially prosecuting the bank's claim on the bank's behalf. Here, in contrast, the timely filed complaint was brought by the institution—Bank of America—which already purports to prosecute the bank's claims. But that fact simply underscores the difficulty in deciding, in a threshold motion regarding jurisdiction, the proper party for prosecuting the claim. We thus limit our holding to the timeliness of the investor plaintiffs' right to intervene, without deciding to whom any recovery might ultimately belong.

## CONCLUSION

As in our earlier decision on the statute of limitations, we again decline to conclude that it was the passage of FIRREA that repudiated plaintiffs' contracts. Rather, accrual of their claim occurred at that moment when they were given written confirmation that their supervisory goodwill would no longer be counted in a manner consistent with their contract: October 6, 1989. Despite the untimeliness of their complaints, however, investor plaintiffs may nonetheless participate in this litigation since their claims are identical to those pursued by the Bank of America, and the defendant thus suffers no prejudice. Investor plaintiffs are thus to be joined as real parties in interest under Rule 17(a).